597 P.2d 1058

**UTAH–IDAHO SUGAR COMPANY (U & I, Incorporated),**
Complainant-Appellant,

v.

**INTERMOUNTAIN GAS COMPANY and Idaho Public Utilities Commission,**
Respondents.

**UTAH–IDAHO SUGAR COMPANY,**
Complainant,

v.

**INTERMOUNTAIN GAS COMPANY,**
Respondent.

No. 12577.

Supreme Court of Idaho.

July 10, 1979.

Wilford M. Burton, of McKay, Burton, McMurray & Thurman, Salt Lake City, Utah, Kent W. Foster, of Holden, Kidwell, Hahn & Crapo, Idaho Falls, for complainant-appellant.

Harold Ryan, of Ryan & Sweet, Weiser, David H. Leroy, Atty. Gen., John J. McMahon, Deputy Atty. Gen., Boise, for respondents.

BAKES, Justice.

Appellant U & I Sugar Company, Inc., brings this appeal from dismissal by the Idaho Public Utilities Commission of U & I's complaint which sought the suspension of Rate Schedule LV–1 which the Commission had approved for use by respondent Intermountain Gas Company and reimbursement of rates collected by Intermountain under Schedule LV–1. U & I asks this Court to reverse the Commission's dismissal of its complaint and to direct the Commission to order Intermountain to refund to U & I amounts collected under Schedule LV– 1. U & I also contends that Intermountain's interpretation of Schedule LV–1 results in an illegal rate discrimination against U & I. Finally, U & I claims that the Commission erred in allowing Intermountain to prorate U & I's gas consumption for the billing period in which the contested schedule became effective if this

Court determines that Schedule LV–1 was properly adopted and implemented. The Commission's decision to allow Intermountain to prorate U & I's gas consumption for the billing period in question is reversed and the Commission's decisions on the remaining issues are affirmed. The Commission's order is therefore reversed and the matter remanded for further proceedings.

I

Appellant U & I operated a sugar beet refining plant in Idaho Falls and was at the time the third largest user of natural gas in Idaho. U & I's largest demand for natural gas occurred following the beet harvest in September and continued until February, during which time the beets were sliced. In June and July the beet syrup was refined and natural gas demand at that time was also high. U & I's slicing operation coincided with the winter heating season and its substantial demand for natural gas at that time contributed to respondent Intermountain Gas Company's peak load which occurs in the winter months.

In October, 1973, Intermountain filed a rate increase application with the Idaho Public Utilities Commission which proposed changes both in the existing rate levels and in the rate structure itself. Among the changes proposed in the rate structure was the introduction of a two-tier tariff for use in assessing charges against large volume firm demand users like U & I who contribute to Intermountain's peak winter load. Schedule LV–1, one of several new rate schedules proposed in Intermountain's application to the Commission, contained in its monthly rate both a "demand charge" and a "commodity charge" component. As eventually implemented by Intermountain, each of these charges was assessed against large volume firm demand consumers who con-

tracted for more than 2,000 therms of gas a day and who were unable to shift gas use to low demand times of the year or whose needs did not allow them to opt for "interruptible service" by which commercial customers would have gas service curtailed when necessary to enable Intermountain to meet the peak demands of residential gas users. Under Schedule LV–1, a large volume firm demand customer would be assessed a demand charge related to its contribution to the winter peak load for which Intermountain must possess adequate gas supplies and delivery facilities, as well as a commodity charge assessed for the gas actually used by that customer. The rationale advanced to support assessment of the demand charge component of Schedule LV–1 was that large firm demand gas consumers should be required to pay the costs of acquiring and maintaining the peak load capacity of the gas supply system necessitated by their needs. The demand charge, as implemented by Intermountain, was assessed monthly throughout the year, was not credited toward actual gas use, and was calculated upon the amount of gas a large volume user contracted to receive on a firm service basis.

Prior to Commission approval of Schedule LV–1, U & I was billed for natural gas under a single-tier rate structure based upon a commodity charge only. The applicable rate schedule contained a minimum monthly charge for which full credit was given U & I in those months when charges for natural gas actually used exceeded the minimum charge.[1] Under Schedule LV–1, U & I was billed each month for the demand charge *plus* the commodity charge for all gas used, with no credit given toward actual gas use for the demand charge.[2]

---

1. *I. e.*, Rate Schedule 24, LARGE VOLUME FIRM SERVICE:

MINIMUM—$2,390.00 per month

| RATE | | | |
|------|------|---------------------------|---------|
| First | 50,000 | therms per month at | $.07281 |
| Next | 50,000 | therms per month at | .06851 |
| Next | 80,000 | therms per month at | .06531 |
| Next | 120,000 | therms per month at | .06001 |
| Next | 200,000 | therms per month at | .05461 |
| Next | 1,300,000 | therms per month at | .04921 |

2. LV–1, LARGE VOLUME–COMBINATION FIRM &/OR INTERRUPTIBLE SERVICE:

MONTHLY MINIMUM CHARGE:

The monthly minimum charge shall be the product of the firm service contract demand times the firm service demand charge. There is no demand charge for interruptible service. A minimum charge of $750 per season is required for seasonal commercial or industrial

Intermountain's proposal that Schedule LV–1 be approved and implemented was filed on October 3, 1973, and considered in Idaho Public Utilities Case No. U–1034–38. Notice of Intermountain's application for the rate increase was served by mail on U & I at both its Idaho Falls and Salt Lake City offices. In connection with its application Intermountain filed then-existing Schedules 24 and 32, together with proposed Schedule LV–1 which was designed to consolidate and replace Schedules 24 and 32. U & I did not intervene or participate in the public hearings conducted in Case No. U–1034–38; however, Joseph Humphris, U & I manager of purchasing, did attend the hearings in the case as an observer. Case No. U–1034–38 was concluded with the issuing of Idaho Public Utilities Commission Order No. 11507 on June 26, 1974, which approved adoption of Schedule LV–1 among others. Intermountain petitioned the Commission for a rehearing in Case No. U–1034–38. Following denial of its petition for rehearing by the Commission, Intermountain appealed Order No. 11507 to this Court, which held that the rate structures and levels approved in that order were reasonable and supported by the evidence presented to the Commission. *Intermountain Gas Co. v. Idaho Public Utilities Commission,* 97 Idaho 113, 127, 540 P.2d 775, 789 (1975). However, Commission Order No. 11507 was set aside by this Court on that appeal for reasons not related to the rate structures approved therein. The rate levels approved by the Commission in Order No. 11507 were subsequently re-implemented. U & I did not petition for a rehearing in Case No. U–1034–38, nor did it appeal to this Court Order No. 11507 approving adoption of Schedule LV–1.

In February, 1975, U & I initiated this action, designated Idaho Public Utilities Commission Case No. U–1034–45, by complaint alleging that the rates approved by the Commission in Case No. U–1034–38 were unreasonable and discriminatory and that Intermountain had improperly applied Schedule LV–1 in denying U & I credit toward actual gas use for the monthly demand charge levied. In September; 1975, U & I submitted an amended complaint in which it reiterated its original allegations and also asked that the rate schedules approved by the Commission in Case No. U–1034–38 be suspended because of failure of Intermountain to follow the procedural requirements for submission to the Commission of rate schedule modifications prescribed in I.C. § 61–307.[3] U & I also alleged in its complaint that Intermountain's meth-

---

service in lieu of the monthly demand charge herein.

MONTHLY RATE:
Demand Charge:
First 10,000 therms demand at 40 cents per therm.
All over 10,000 therms demand at 23.2 cents per therm.
Commodity Charge:
First 10,000 therms per month at $.09896 per therm
Next 20,000 therms per month at .09096 per therm
Next 70,000 therms per month at .08396 per therm
All over 100,000 therms per month at .07496 per therm.

3. "61–307. SCHEDULES—CHANGE IN RATE AND SERVICE.—Unless the commission otherwise orders, no change shall be made by any public utility in any rate, fare, toll, rental, charge or classification, or in any rule, regulation or contract relating to or affecting any rate, fare, toll, rental, charge, classification or service, or in any privilege or facility except after thirty (30) days' notice to the commission and to the public as herein provided. Such notice shall be given by filing with the commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force, and the time when the change or changes will go into effect. The commission, for good cause shown, may allow changes without requiring the thirty (30) days' notice herein provided for, by an order specifying the changes so to be made and the time when they shall take effect, and the manner in which they shall be filed and published. When any change is proposed in any rate, fare, toll, rental, charge or classification, or in any form of contract or agreement or in any rule, regulation or contract relating to or affecting any rate, fare, toll, rental, charge, classification or service, or in any privilege or facility, attention shall be directed to such change on the schedule filed with the commission by some character to be designated by the commission, immediately preceding or following the item."

od of prorating U & I's gas use in the month of July, 1974, when Schedule LV–1 became effective, resulted in an overcharge. U & I asserted that its summer juice operation, which allegedly accounted for substantially all of U & I's summer demand for natural gas, was concluded prior to July 23, 1974, the implementation date of Schedule LV–1. U & I contended that the proration method of billing for gas used in the July, 1974, billing period improperly caused gas actually used under the old tariffs to be billed under the new higher rate schedule and asked that the July, 1974, bill be recomputed and the alleged overcharge of $44,779.58 be refunded to U & I.

In February, 1976, Intermountain again petitioned the Commission for a general rate increase and U & I moved to intervene in that case. U & I was allowed to intervene in the second Intermountain rate case, designated Commission Case No. U–1034–57, and the complaint case, Case No. U–1034–45, was consolidated with Case No. U–1034–57. After granting Intermountain a second rate increase in Case No. U–1034–57 the Commission issued Order No. 12868 which dismissed U & I's complaint initiating Case No. U–1034–45. The Commission held that U & I was barred by I.C. § 61–612[4] from challenging the reasonableness of Schedule LV–1; that U & I's claim that Intermountain's proposal of Schedule LV–1 was invalid because of the failure by Intermountain to comply with the requirements of I.C. § 61–307 was an impermissible collateral attack on a Commission order barred

by I.C. § 61–625;[5] that Intermountain properly interpreted the provisions of Schedule LV–1 to bar U & I credit for the monthly demand charge component of Schedule LV–1 toward actual gas used; that the levy of the demand charge against large volume users such as U & I who require firm service at peak demand periods was not discriminatory; and that use of the proration method of billing for gas used in July, 1974, when Schedule LV–1 was implemented, was reasonable. The Commission denied U & I's petition for rehearing in Case No. U–1034–45 and U & I has appealed the Commission's decision to this Court.

II

We address first U & I's contention that as a result of Intermountain's improper submission of Schedule LV–1 to the Commission for consideration the Commission was without authority to approve the implementation of the schedule in Case No. U–1034–38. U & I argues that it is entitled to have Schedule LV–1 suspended and the charges collected under Schedule LV–1 which exceed those authorized by its predecessor tariffs refunded.

It is conceded that Intermountain did not call attention "by some character to be designated by the commission" to the sections of Schedule LV–1 in which changes from existing rate schedules were proposed, as required by I.C. § 61–307. However, Intermountain did submit its proposed new rate schedules to the Commission together with copies of the then effective rate schedules and submitted Exhibit 12–A with its appli-

---

**4.** "61–612. COMPLAINT AGAINST UTILITY. —*Complaint may be made by the commission of its own motion* or by any corporation or person, chamber of commerce, board of trade, or any civic, commercial, mercantile, traffic, agricultural or manufacturing association or organization or any body politic or municipal corporation, by petition or complaint in writing, setting forth any act or thing done or omitted to be done by any public utility including any rule, regulation or charge heretofore established or fixed by or for any public utility, in violation, or claimed to be in violation of any provision of law or of any order or rule of the commission: provided, that no complaint shall be entertained by the commission, except upon its own motion, as to the reasonableness of any rate or charges of any gas, electrical, water or

telephone corporation, unless the same be *signed by the mayor or the president or chairman of the board of trustees or a majority of the council,* commission or other legislative body of the city or county or city or town, if any, within which the alleged violation occurred, or not less than 25 consumers or purchasers or prospective consumers or purchasers of such gas, electricity, water or telephone service."

**5.** "61–625. ORDERS NOT SUBJECT TO COLLATERAL ATTACK.—All orders and decisions of the commission which have become final and conclusive shall not be attacked collaterally."

cation for rate increase which indicated the impact the proposed increases would have on certain individual large volume firm demand customers, including U & I. Intermountain also prefiled testimony by Albert Smith, Intermountain's vice-president of customer relations, which explained the mechanics of the new two-tier rate structure proposed in Intermountain's application. In cross examination at the hearings Smith. again explained the effect of the new schedule, LV-1, with its separate demand charge component.

U & I was one of a small number of Intermountain's customers to receive formal notice of the hearings in Commission Case No. U–1034–38, in which Intermountain's rate increase proposals were considered. The notice was sent by mail to two of U & I's offices and stated the purpose of the proceedings, the time and place of the hearing, and indicated that U & I could participate in the hearing if it desired. Joseph Humphris, U & I manager of purchasing, did attend the Commission hearings in Commission Case No. U–1034–38 as an observer. U & I, however, did not intervene and formally participate in the rate case. U & I did not petition the Commission for a rehearing after issuance of Com-

mission Order No. 11507 which partially approved Intermountain's rate increase request, nor did it appeal the Commission's order to this Court.

The legislature has afforded the orders of the Commission a degree of finality similar to that possessed by judgments made by a court of law. I.C. § 61–625 reads as follows:

"61–625. ORDERS NOT SUBJECT TO COLLATERAL ATTACK.—All orders and decisions of the commission which have become final and conclusive shall not be attacked collaterally."

U & I's complaint, insofar as it challenges the procedures by which Intermountain submitted its rate increase application subsequently considered and in part approved by the Commission in Case No. U–1034–38, is an impermissible collateral attack on the Commission's order which concluded that case. Final orders of the Commission should ordinarily be challenged either by petition to the Commission for rehearing or by appeal to this Court as provided by I.C. §§ 61–626 and –627; Id. Const. Art. 5, § 9.[6] A different rule would lead to endless consideration of matters previously presented

6. "61–627. APPEAL TO SUPREME COURT— NOTICE OF APPEAL—MATTERS REVIEWABLE ON APPEAL—EXTENT OF REVIEW— RECORD ON APPEAL.—After an application for rehearing is denied, or, if the application is granted, then after the rendition of the decision on rehearing, the state of Idaho or any party aggrieved may appeal to the supreme court from any order of the public utilities commission by filing a notice of appeal and serving the same in the manner provided by the rules of the supreme court. Upon the payment of the fee therefor, the secretary of the public utilities commission shall prepare, certify, and deliver to the clerk of the supreme court one (1) copy of the transcript of the testimony, the pleadings (moving papers, records, complaints, petitions, answers, and proceedings) in the cause, the pertinent preliminary orders of the commission, the order appealed from, the notice of appeal, and such other relevant documents from the commission files as may be appropriate under rules adopted by the supreme court for its appeals and shall also certify and deposit with the clerk of the Supreme Court the original exhibits from that proceeding."

Prior to 1977, I.C. § 61–627 read as follows: "61–627. APPEAL TO SUPREME COURT.— Within thirty (30) days after the application for a rehearing is denied, or, if the application is granted, then within thirty (30) days after the rendition of the decision on rehearing, any party aggrieved may appeal to the Supreme Court from any order of the public utilities commission for the purpose of having the lawfulness of such order inquired into and determined."

"[Art. 5] § 9. ORIGINAL AND APPELLATE JURISDICTION OF SUPREME COURT.—The Supreme Court shall have jurisdiction to review, upon appeal, any decision of the district courts, or the judges thereof, and any order of the public utilities commission, and any order of the industrial accident board: the legislature may provide conditions of appeal, scope of appeal, and procedure on appeal from orders of the public utilities commission and of the industrial accident board. On appeal from orders of the industrial accident board the court shall be limited to a review of questions of law. The Supreme Court shall also have original jurisdiction to issue writs of mandamus, certiorari, prohibition, and habeas corpus, and all writs necessary or proper to the complete exercise of its appellate jurisdiction."

to the Commission and confusion about the effectiveness of Commission orders.

 U & I argues that the requirements of I.C. § 61–307 are jurisdictional. It claims that failure by Intermountain to properly submit its rate application deprived the Commission of power to consider or approve the proposals, making the Commission's order challenged here void and therefore vulnerable to attack in a collateral proceeding. Although an administrative order may generally be collaterally attacked when the issuing agency lacks jurisdiction over the matter considered, *see* Davis, 2 Administrative Law Treatise, § 18.10 (1958), the defect complained of in this appeal is procedural and not jurisdictional. I.C. § 61–307 is not the code section which grants jurisdiction or powers to the Idaho Public Utilities Commission. Chapter 3 of Title 61, which contains I.C. § 61–307, is entitled "Duties of Public Utilities." I.C. § 61–307 defines the procedures by which public utilities must give notice to the Commission and the public of proposed changes in rate increases. Mere procedural errors do not render an order of the Commission vulnerable to collateral attack unless those errors result in a denial of due process to a party. *Cf. Market Street Ry. Co. v. California RR. Comm'n*, 24 Cal.2d 378, 150 P.2d 196 (1944), *aff'd* 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945) (where notice in course of the agency hearings informed petitioner that the reasonableness of its rates was in question and petitioner had adequate opportunity to present evidence on the issue, the fact that the issue of unreasonableness of rates was not formally framed in the hearings did not render the agency's decision on that issue a denial of due process to petitioner).

The Utah Supreme Court in *Utah Gas Service Co. v. Mountain Fuel Co.*, 18 Utah 2d 310, 422 P.2d 530 (1967), was faced with the appellant's contention that it had received a defective and late notice of a competitor's application for authorization to provide natural gas service to a particular area of the state. Appellant sought reversal of the order of the Utah Public Service Commission in part on this ground. In dismissing this argument by appellant, the court made these remarks which we find applicable to our decision in this case:

"In proceedings before an administrative agency what a party is entitled to is to be treated with fairness: to have the opportunity to prepare and present his case and his contentions with respect thereto; and to have an adjudication in conformity with the law; and the decisions of the Commission will not be overturned because of irregularities of procedure from which there is no substantial prejudice or adverse effect. The matters plaintiff complains of are not of any such consequence. It in fact received notice, filed its protest and counter-petition; and was in no way limited or prevented from full participation in the proceedings." 422 P.2d at 532.

U & I was apprised of the proposed rate increases which were to be considered in Commission Case No. U–1034–38 and of its right to participate in the hearings in which those proposed increases were considered by the Commission. Review of alleged procedural errors occurring in Commission proceedings which are not so substantial as to deny an interested party due process must be sought either in the Commission's proceedings, by petition for a rehearing made to the Commission after a decision has been rendered, or by appeal to this Court from a Commission order.

### III

 Appellant U & I maintains that if we hold that Intermountain's rate increase application considered in Commission Case No. U–1034–38 was properly approved by the Commission, Intermountain has improperly applied the terms of Schedule LV–1 which was implemented following the Commission's order concluding that case. It is U & I's contention that Intermountain must as a matter of law afford U & I credit toward actual gas use for the $9,800 monthly demand charge levied under Schedule LV–1. U & I argues that Schedule LV–1 is ambiguous, that Intermountain's application of Schedule LV–1 is improper, and that

Intermountain's interpretation results in unjust rate discrimination against those gas customers served by Schedule LV–1 in violation of I.C. § 61–315.[7] This claim is not an impermissible collateral attack on the Commission order in Case No. U–1034–38, but a request that the Commission enforce the terms of rate tariffs adopted by Intermountain under authority of the order in Case No. U–1034–38. U & I has properly invoked our appellate jurisdiction in asking us to review that part of the Commission's order in U & I's complaint case, Commission Case No. U–1034–45, which held that Intermountain has properly interpreted Schedule LV–1 and that no illegal rate discrimination results from that interpretation.

U & I first claims that proper interpretation of Schedule LV–1 requires Intermountain to give consumers billed under Schedule LV–1 credit toward their gas use for the demand charge in those months when charges for gas use exceed the demand charge. This argument requires a careful analysis of Schedule LV–1, which reads as follows:

"Rate Schedule LV–1

LARGE VOLUME COMBINATION FIRM and/or INTERRUPTIBLE SERVICE

"AVAILABILITY:

"Available at any point on Company's distribution system to any consumer upon execution of a one-year written service contract for firm and/or interruptible service in excess of 2,000 therms per day. Seasonal and irrigation service is available under this rate schedule and shall be subject to the requirements under Section 16 of the General Service Provisions.

"MONTHLY MINIMUM CHARGE:

"The monthly minimum charge shall be the product of the firm service contract demand times the firm service demand charge. There is no demand charge for

interruptible service. A minimum charge of $750 per season is required for seasonal commercial or industrial service in lieu of the monthly demand charge herein.

"MONTHLY RATE:

"Demand Charge: First 10,000 therms demand at 40¢ per therm.

All over 10,000 therms demand at 23.2¢ per therm.

"Commodity Charge:

First 10,000 therms per month .09896 per therm

Next 20,000 therms per month .09096 per therm

Next 70,000 therms per month .08396 per therm

All over 100,000 therms per month .07496 per therm

"SERVICE CONDITIONS:

"All natural gas service hereunder is subject to the General Service Provisions by the Company's Tariff, of which this rate schedule is a part.

"Issued July 1, 1974 Effective July 23, 1974."

The schedule contains two components, (1) a "monthly minimum charge" and (2) a "monthly rate." The "monthly rate" component is made up of two sub-components, a "demand charge" and a "commodity charge." U & I, at the time Schedule LV–1 was implemented, had contracted for 35,000 therms per month of firm service gas delivery as well as substantial amounts of gas to be delivered on an interruptible service basis. This 35,000 therm firm service contract demand is the basis for calculating both the "monthly minimum charge" and the "demand charge" component of the "monthly rate." The "monthly minimum charge" component will in all cases equal the "demand charge" sub-component of the "monthly rate" for a firm service demand customer. In this case, both equalled $9,800

7. "61–315. DISCRIMINATION AND PREFERENCE PROHIBITED.—No public utility shall, as to rates, charges, service, facilities or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities or in any other respect, either as between localities or as between classes of service. The commission shall have the power to determine any question of fact arising under this section."

per month. While U & I is correct that the $9,800 "monthly minimum charge" should be applied against the "monthly rate" and that when the monthly rate exceeds the "monthly minimum charge" of $9,800, there would be no "monthly minimum charge" to pay, nevertheless the "demand charge" component of the "monthly rate" will always equal the "monthly minimum charge." U & I's monthly rate under Schedule LV–1 is composed of the sum of the "demand charge" and the "commodity charge." As the schedule is now drawn, the "minimum monthly charge" is meaningless. It is identical to the "demand charge" component of the "monthly rate." This redundancy may well have been the source of the confusion giving rise to this litigation.

■■■■ Our role in reviewing actions of the Commission taken within its jurisdiction is a limited one. In reviewing findings of fact we will sustain a Commission's determination unless it appears that the clear weight of the evidence is against its conclusion or that the evidence is strong and persuasive that the Commission abused its discretion. *See, e. g., Intermountain Gas Co. v. Idaho Public Utilities Comm'n,* 97 Idaho 113, 540 P.2d 775 (1975); *Burlington Out Now v. Burlington Northern, Inc.,* 96 Idaho 594, 532 P.2d 936 (1975); *Washington Water Power Co. v. Idaho Public Utilities Comm'n,* 84 Idaho 341, 372 P.2d 409 (1962); I.C. § 61–629.[8] Although the construction of a contract is generally regarded as a question of law, *see e. g., Commercial Credit Corp. v. Chisholm Bros. Farm Equip. Co.,* 96 Idaho 194, 525 P.2d 976 (1974); *National Produce Distributors v. Miles & Meyer, Inc.,* 75 Idaho 460, 274 P.2d 831 (1954), the construction of technical terms and provisions in public utility rate schedules is an endeav-

or peculiarly within the realm of the Commission's expertise. We will sustain the Commission's rulings on the meaning of such technical rate schedules where the decision is based upon a reasonable interpretation of the instrument. *See Columbia Gas Transmission Corp. v. Federal Power Comm'n,* 174 U.S.App.D.C. 204, 530 F.2d 1056 (1976) (the court will defer to some degree to agency views on the meaning of a contract where an understanding of documents involved is enhanced by the agency's technical knowledge of industry conditions and practices). *Cf. North Atlantic Westbound Freight Ass'n v. Federal Maritime Comm'n,* 130 U.S.App.D.C. 122, 397 F.2d 683 (1968) (where underlying issues of fact and policy are involved an agency's interpretation of an agreement is due judicial respect and deference). The interpretation of Schedule LV–1 adopted by Intermountain and affirmed by the Commission in its Order No. 13030 which denied U & I's petition for rehearing in its complaint case, Case No. U–1034–45, is a reasonable reading of the tariff. Therefore, we affirm that part of the order appealed from which determines that U & I is not due credit toward its gas consumption for the demand charge component of Schedule LV–1.

## IV

U & I argues that if we do affirm the interpretation of the demand charge component of Schedule LV–1 made by Intermountain and the Commission the rates charged U & I for gas will unreasonably discriminate against U & I in violation of I.C. § 61–315.[9] It is U & I's contention that because residential and small volume commercial gas users who are billed under

8. "61–629. MATTERS REVIEWABLE ON APPEAL—EXTENT OF REVIEW—JUDGMENT. —No new or additional evidence may be introduced in the Supreme Court, but the appeal shall be heard on the record of the commission as certified by it. The review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the Constitution of

the United States or of the state of Idaho. Upon the hearing the Supreme Court shall enter judgment, either affirming or setting aside the order of the commission. In case the order of the commission is set aside the commission, upon its own motion or upon motion of any of the parties, may alter or amend the order appealed from to meet the objections of the court in the manner prescribed in section 61–624."

9. *See* n. 7, *supra.*

Schedule GS–1 receive credit toward their gas use for the monthly minimum charges assessed under that rate tariff, to deny large volume firm service customers billed under Schedule LV–1 credit toward their actual use for the monthly demand charge is to give GS–1 users an illegal rate preference. U & I characterizes the demand charge component as a monthly charge for the privilege to receive gas from Intermountain and asserts that to levy this charge only against large volume firm demand users is patently discriminatory. We disagree with U & I and hold that Schedule LV–1, as interpreted by Intermountain and the Commission, establishes a reasonable classification of customers for rate purposes and that it does not unreasonably discriminate against large volume gas users.

■ Differences in rates charged to different classes of customers is not *per se* unreasonable or unlawful. I.C. § 61–315 bars *unreasonable* differences as to rates and grants the commission power to determine what constitutes unreasonable rate discrimination.

"There is no requirement that rates for different classes of service must be either uniform or equal or that they must be equally profitable. Differences in rates between classes of customers based on such criteria as the quantity of electricity used, nature of the use, the time of the use, the pattern of the use, or based on differences of conditions of service, or cost of service are not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation." *Pennsylvania Public Utility Comm'n v. Metropolitan Edison Co.,* 86 P.U.R.3rd 163, 195–96 (Pa. Pub.Util.Comm.1970).

"A discrimination as to rates is not unlawful where based upon a reasonable classification corresponding to actual differences in the situation of the consumers for the furnishing of the service; and a public utility or a municipal corporation operating a public-service plant may make reasonable classification as to rates for public service." 64 Am.Jur.2d, Public Utilities § 117 (1972).

*See also Idaho Power Co. v. Thompson,* 19 F.2d 547 (9th Cir. 1927).

■ Inquiry into the reasons for the establishment of the two-tier rate structure incorporated into Schedule LV–1 satisfies us that assessment of a demand charge against large volume firm service gas consumers is not a discriminatory rate practice. The demand charge contained in Schedule LV–1 is assessed only against large volume users who contract for firm service, i. e., users who contract for the right to receive large volume service even on peak load winter days. These large volume firm service customers contribute substantially to the utility's sharply peaked winter load, and they are assessed by use of a demand charge a proportionate share of the utility's costs incurred in meeting that peak. Large volume interruptible customers who choose to allow service curtailment when demand approaches the system's capacity to deliver gas are assessed only the commodity charge component of Schedule LV–1. Likewise, seasonal industrial and irrigation customers whose gas requirements do not contribute to the utility's winter peak do not pay a demand charge under the terms of Schedule LV–1.

The record indicates that the costs recovered by assessment of a demand charge includes plant costs incurred to meet firm service gas delivery demands on peak demand days, the cost of the gas itself, and costs related to underground and liquified storage which is established from supplier pipelines during non-peak periods and drawn upon to meet peak demands. The demand charge is directly related to the amount of gas LV–1 users contract for on a firm service basis and may be reduced or increased as the user alters the firm service demand its operations require. Although the utility's maximum demand may be reached only occasionally, the charge is assessed by the utility year around since the costs of establishing and maintaining a gas supply system capacity adequate to deliver maximum demand remains constant. The charge also provides an economic incentive

for users to shift large volume demands to non-peak periods when the utility can more economically supply the customer's requirements.

Inherent in Schedule LV–1 is a classification of customers by volume and service requirements. The Commission made the following findings in Order No. 12868, issued in Commission Case No. U–1034–45, with respect to U & I's assertion that Intermountain's interpretation of the demand charge component of Schedule LV–1 resulted in unreasonable rate discrimination between Schedule GS–1 customers and firm service customers served under Schedule LV–1:

"[FINDINGS OF FACT] XIX

"The Complainant's use of natural gas occurs during the months of October, November, December, January and June each year. Thus, the great majority of complainant's natural gas use is coincidental with Respondent's peak demand responsibility and during the period of highest need for natural gas.

XX.

"It should be clear to Complainant that the need and demand for natural gas must be computed on a peak period basis. For the purposes of supply contracts and negotiations, Respondent is required to enter into contracts for firm gas supply from its wholesaler, Northwest Pipeline Company, for quantities of gas which will equal or approximate the gas demand during Respondent's peak periods.

XXI.

"These supply contracts carry a demand charge for the contracted level of gas supply which must be paid for daily supply commitments. These demand charges paid by Respondent are similar in nature to the demand charges paid by all large industrial (LV–1) customers. Respondent, like Complainant, is required to pay these demand charges regardless of whether any gas is consumed or taken from the pipeline during certain periods of the year.

XXII.

"The demand charge concept is one that attempts to value and charge a customer for the fixed costs of providing a service. Clearly, certain fixed costs are incurred by any business regardless of whether they are able to sell their product or service. These costs become part of the basic cost that must go into any calculation of price for the ultimate service or commodity.

XXIII.

"The demand charges paid by Complainant represent the required payment for Complainant to be entitled to the availability of service at the time it desires service. That is the concept of a firm service contract. Complainant is paying a demand charge which entitles it to take natural gas up to its contract level any time during the year. It is the choice of Complainant to take gas for only a five month period. While we recognize this seasonal consumption is a characteristic of Complainant's business, it does not relieve Respondent of its investment in gas plant in service, necessary to serve Complainant which remains in service twelve months of the year. There are other peak period customers which share similar load characteristics, such as potato processors.

XXIV.

"Complainant would have us ignore the fact that its demand for gas service occurs during the very most difficult time of the year for Respondent to fill all demand requirements, that is the winter heating season.

XXV.

"The ignoring of this factor would abuse all cost of service concepts and give Complainant a cost benefit at the expense of all other customers who would have to

make up the lost revenues necessary to cover Respondent's fixed charges and incurred demand costs.

## XXVI.

"Such a result on its face is unreasonable, unjust and would be discriminatory to all classes of service and to customers with even load characteristics or who consumed natural gas during off peak periods to the benefit of Respondent's overall load factor and not to the detriment of the already sharply peaked winter demand."

There is ample basis for the Commission's conclusion that the assessment of the demand charge against large volume firm service gas customers is not unreasonable rate discrimination. We affirm the Commission's findings in that respect.

### V

■■■ U & I's final contention on this appeal is that Intermountain's calculation of U & I's gas bill for the month in which Schedule LV–1 was implemented was error. This, like U & I's contention that Intermountain and the Commission erroneously interpreted Schedule LV–1, is not a collateral attack on the Commission's order in Case No. U–1034–38, but is a permissible challenge to implementation of that order. Schedule LV–1 was approved by the Commission for implementation on July 23, 1974. U & I's billing period in which that date fell commenced on June 28, 1974, and ended July 31, 1974. Intermountain, in implementing Schedule LV–1 on July 23, 1974, did not read U & I's gas meters on that date in order to ascertain the actual amounts of gas consumed under each of the two rate tariffs applicable to the billing period, but prorated the gas used during the period to each of the two rate schedules. Intermountain assumed for billing purposes that U & I consumed an equal amount of gas on each day of the billing period and charged U & I for $^{24}/_{33}$ of its consumption at the rates contained in the old tariff Schedules 24 and 32, while the remaining $^{9}/_{33}$ of the quantity consumed was billed under Schedule LV–1. The result was that U & I was billed a total of $122,399.17 for 1,577,-656 therms consumed between June 28 and July 31, 1974.

U & I claims that its gas consumption during the July, 1974, billing period did not occur on an equal daily basis and that, as a result, it was error for Intermountain to apply a proration formula to U & I's consumption in that period. As noted, the basic assumption made in a utility's proration billing method is that equal amounts of gas are used on each day of the period. U & I alleges that the major portion of its summer gas consumption is attributable to the sugar beet juicing operation. In the hearings conducted by the Commission in U & I's complaint case, Joseph Humphris, U & I's manager of purchasing, testified that the 1974 juicing operation ended on July 22, 1974, and that gas use for the remainder of the billing period was minor in comparison to that used while the beets were juiced. Humphris testified that gas use for the period between July 23 and July 31, 1974, "would have approximately been about maybe 7,000 or 8,000 therms total for the week." U & I argues that Intermountain should have billed U & I for only 8,000 therms used in July, 1974, under Schedule LV–1 and that the remainder of the 1,577,-656 therms used in that period should have been billed under Schedule LV–1's predecessor rate tariffs. U & I asks for $44,-779.58 refund as a result of the alleged improper calculation of its July, 1974, billing.

■■■ Ordinarily, proration of utility service costs in periods in which a new tariff becomes effective is a reasonable and acceptable method for implementing new tariffs. It was contended in *Cardone v. Consolidated Edison Co. of New York, Inc.,* 88 P.U.R. (N.S.) 117 (N.Y.Pub.Serv.Comm. 1951), that Consolidated Edison improperly prorated consumers' utility bills in January, 1949, during which month new schedules were implemented. The complainant contended that the utility should not have prorated its billings, but should have applied the new higher rate at the beginning of each customer's first full billing period com-

**380**

mencing after the effective date of the new rates. The Commission rejected that argument, noting that to do so would result in some consumers paying for service at old rates while other consumers paid at the new rates for contemporaneous service, resulting in illegal rate discrimination. The Commission held that proration was necessary because of the impracticality of reading all meters the same day. However, unlike the *Consolidated Edison* case which involved innumerable consumers each using small amounts of energy, there were only 76 large volume customers whose rates were substantially increased by Schedule LV–1. In view of the small number of customers involved, the large amounts of gas consumed by each, and the substantial rate increase effected by implementation of Schedule LV–1, it is not unreasonable to require the utility to have read the meters of those customers affected by the rate increase on the date the new schedule was implemented. That, together with the testimony of Mr. Humphris that U & I's major consumption of gas in the summer of 1974 had concluded on July 22, the day that it ended its juicing operation, and that the gas use for the period between July 23 and July 31, 1974, "would have approximately been about maybe 7,000 or 8,000 therms total for the week" sustains U & I's claim for a refund. Intermountain cannot rely upon a proration when it was reasonable to have read the meters for the large volume customers on the date the new schedule became effective. The Commission's ruling that proration of U & I's July, 1974, gas bill was reasonable is not supported by the record. Therefore, Commission Order No. U–1034–45 is set aside and the cause remanded to the Commission for further proceedings not inconsistent with this opinion. *See Intermountain Gas Co. v. Idaho Public Utilities Comm'n,* 97 Idaho 113, 540 P.2d 775 (1975); I.C. § 61–629.[10].

Reversed.

DONALDSON, C. J., SHEPARD and BISTLINE, JJ., and SCOGGIN, J. pro tem., concur.