746 P.2d 33

**MARCO CRANE AND RIGGING, dba Diamond T Trailer Park, Plaintiff/Appellant,**

v.

**ARIZONA CORPORATION COMMISSION, Defendant/Appellee,**

and

**Southern Union Gas Company, Intervenor/Defendant/Appellee.**

**No. 2 CA–CV 87–0232.**

Court of Appeals of Arizona, Division 2, Department A.

Nov. 10, 1987.

Snell & Wilmer by Daniel J. McAuliffe and Eileen J. Moore, Phoenix, for plaintiff/appellant.

Arizona Corporation Com'n by Janice M. Urbanic, Phoenix, for defendant/appellee.

Evans, Kitchel & Jenckes, P.C. by Lex J. Smith and Robert J. Itkin, Phoenix, for intervenor/defendant/appellee.

## OPINION

HOWARD, Presiding Judge.

This is an appeal from the granting of a summary judgment. Appellant Marco Crane and Rigging (Marco Crane) is the owner of a trailer park in Coconino County known as the Diamond T Trailer Park. This park is located in the service territory certified to Southern Union Gas Company (Southern Union). The issue in this case is whether Southern Union is required to pay for the replacement of deteriorated gas pipes located in the trailer park. The answer is no.

The facts in this case are undisputed. The trailer park contains approximately 50 trailer spaces which are rented to tenants. Prior to March 31, 1981, Southern Union provided natural gas service to the trailer park to a point of delivery on the perimeter of Marco Crane's property. The tenants of the Diamond T Trailer Park received gas service from the point of delivery to the point of consumption through gas pipes which were owned and operated by Marco Crane and located on and within its private trailer park property.

Southern Union provided gas utility service to Marco Crane as the consumer of record through a master meter located on Marco Crane's Diamond T property. Marco Crane was billed directly for all gas consumed by the trailer park tenants and had sole and complete responsibility, as a consumer of record, for the payment for gas service rendered to the trailer park during this time. None of the individual trailer park tenants had accounts with Southern Union for service during this time. Marco Crane billed the Diamond T residents directly for gas service on a pro rata basis; it did not pass along to its tenants any of the costs associated with the ownership, operation or administration of its gas distribution system.

On April 1, 1981, a train derailment involving a number of propane tank cars occurred in an area immediately adjacent to the trailer park. Gas leaks were discovered in the trailer park's privately owned gas pipes within the park, and Southern Union temporarily disconnected service in order to avoid an explosion. After this emergency ended, Southern Union was unable to restore gas service because numerous leaks made continued gas service hazardous. This gas service was authorized by Southern Union's tariffs.

Marco Crane hired an outside plumbing concern to repair its gas pipes within the trailer park, which determined that the piping was beyond repair. Marco Crane decided to replace the trailer park gas service lines and requested Southern Union's assistance. The lines were replaced and individual meters were installed on the Diamond T property. Southern Union sent Marco Crane a bill for the labor and material it expended in replacing Marco Crane's trailer park gas lines. When Marco Crane refused to pay, Southern Union filed a complaint in the Coconino County Superior Court. Marco Crane filed a complaint with the Corporation Commission against Southern Union praying for a declaration that Southern Union was obligated to replace the privately owned natural gas lines and related facilities of Diamond T at Southern Union's own expense. The superior court action was stayed pending a determination by the Corporation Commission. After a public hearing and after all the issues had been briefed and argued, the commission received a recommended opinion and order from the chief hearing officer, finding that Southern Union was not required to install the gas lines in question at its own expense and that Southern Union's tariffs permitted it to require and obtain reimbursement from Marco Crane for services provided in installing any replacement gas lines. Thereafter, the commission considered the hearing officer's recommended opinion and order and rendered its own decision determining that (1) Southern Union's lawfully approved tariffs did not require Southern Union to replace at its own expense and/or thereafter operate yard lines located entirely on the property of another, and (2) the charges assessed by Southern Union for services provided to Marco Crane in connection with the replacement of said yard lines were not prohibited by any provision of Southern Union's tariffs and were specifically authorized by section 12 of the tariffs.

Marco Crane then filed a complaint in the Maricopa County Superior Court seeking review of the commission's decision and moved for summary judgment against the commission and Southern Union. Southern Union and the commission each filed cross-motions for summary judgment against Marco Crane, which the trial court granted.

Before discussing the substantive issues involved in this case, it is worthwhile to note the burden of proof which Marco Crane must sustain in order to prevail.

This burden is set forth in A.R.S. § 40–254(E) which provides:

"In all trials, actions and proceedings the burden of proof shall be upon the party adverse to the commission or seeking to vacate or set aside any determination or order of the commission to show by clear and satisfactory evidence that it is unreasonable or unlawful."

Not only is there a higher burden of proof in these cases, but there is also a judicial deference to the expertise of the commission. Interpretation of technical terms and provisions in public utilities rate schedules is peculiarly within the realm of the commission's expertise, and the courts will sustain the commission's ruling on the meaning of such technical rate schedules where the decision is based upon reasonable interpretation of the instrument. *Utah-Idaho Sugar Company v. Intermountain Gas Company,* 100 Idaho 368, 597 P.2d 1058 (1979).

The superior court affirmed the decision of the Corporation Commission. The scope of appellate review in these cases is as set forth in *Tucson Electric Power Company v. Arizona Corporation Commission,* 132 Ariz. 240, 244, 645 P.2d 231, 235 (1982):

"It should be noted that an appellate court reviews the Superior Court's decision and not the Commission's, and a Superior Court's ruling on the Commission's decision will be upheld if supported by reasonable evidence. [citation omitted] If the Superior Court has disturbed the Commission's findings, an appellate court will examine the Superior Court's contrary conclusions to see if they are supported by clear and satisfactory evidence. A.R.S. § 40–254(E)."

Marco Crane argued below and argues on appeal that Southern Union's tariffs sections 4, 5, 12 and 16 require Southern Union to pay for the pipelines replaced by Southern Union at Marco Crane's request. Section 4 provides:

"The point of delivery for all gas delivered to any consumer shall be at the *point of interconnection between the facilities of the Company and those of such consumer. Unless otherwise agreed to in writing by the Company such interconnection shall be located at the point on the consumer's property line* most accessible to the Company's distribution system or requiring the shortest extension of the Company's existing distribution mains." (Emphasis supplied.)

Under section 4 the point of delivery is deemed to be located at the customer's property line most accessible to existing Southern Union facilities, unless a different point is designated in writing by both Southern Union and the customer. No such alternative designation was made in this case and, therefore, Marco Crane's property line is the "point of delivery." As the commission noted in its decision:

"Diamond T has also attempted to avoid the application of Sections 4, 5, and 12, by arguing that the individual tenants must be considered as customers for purposes of determining the relative responsibilities of the parties, rather than Diamond T. We agree with Southern Union that financial responsibility is ordinarily fixed by the relation of the parties at the time the disputed expenditure is incurred and not by some sort of ex post facto reconstitution of that relationship."

■ The position taken by the commission is a reasonable and logical conclusion. The financial responsibility between the parties must be fixed by the relation of the parties at the time the disputed expenditure is incurred. The replacement was done by Marco Crane's request, and at the time of the request Marco Crane was the consumer.

The commission found that, as between Southern Union and the property owner, the responsibility for facilities beyond the point of delivery, that is, the Marco Crane property line, is with the property owner. It based this upon sections 12(a) and (b) of the tariff, which provide:

"(a) When the meter is located on the consumer's property line, the Company at its own expense, shall make the necessary connection at the point of delivery between its facilities and those of the consumer, and shall furnish and install

the service cock, any necessary regulator, the meter and the upstream side of the meter loop. *The consumer, at his own expense, shall furnish and install all other pipe, fittings and connections between the point of delivery and the place of consumption.*

(b) When the meter is located other than on the consumer's property line, the Company shall furnish and install the meter, and shall also furnish the service cock and any necessary regulator, but the Company may require the consumer, at his own cost and expense, to install said service cock and regulator (which shall remain the property of the Company), to furnish and install both sides of the meter loop and to make all other connections (except at the meter) between his facilities and those of the Company. In any event, *in such situations the service line between the point of delivery and the meter shall either be furnished and installed by the consumer or, if the Company so elects, such service line may be furnished and installed by the Company and the consumer required to reimburse the Company in advance for the estimated cost thereof.*" (Emphases supplied.)

We believe that the commission was correct. Under section 12(a) and (b) the company is required to furnish and install a meter, service cock and regulator. The cost of installing service lines downstream from the point of delivery, the Diamond T property line, is clearly the responsibility of the consumer, Marco Crane.

Marco Crane argues that section 12(a) does not apply because section 12(e) specifically applies to mobile homes. Section 12(e) provides:

\* \* \* \* \* \*

"*The Company may decline service* to mobile residences or portable or other temporary structures if the conditions do not, in its opinion, afford adequate protection for the occupant(s) thereof, or the persons or property of others. *If service is rendered, the occupant(s) may be charged a non-refundable connect charge* of $25 (as a contribution in aid of construction) payable in advance to defray a portion of the Company's cost in constructing or renewing a service line from its main to a connection with the consumer's yard line." (Emphasis supplied.)

We do not agree with Marco Crane's contention. Section 12(e) does not apply to replacement of a service line upon request by the customer, but only to the installation of service lines to new mobile home residents upon original application.

Marco Crane asserts that section 5 of the tariffs makes Southern Union responsible for the costs of installation of the replacement service line. We do not agree. Section 5 states:

"(a) The Company shall be responsible for the safe conduct and handling of the gas until it passes the point of delivery specified in Section 4 of these regulations ... [and] for the safe installation of its meter, service cock, regulator and related fittings, and shall be responsible for the safe maintenance of all property of the Company installed either by the Company or by the consumer downstream of the point of delivery....

*[T]he entire responsibility for the safe conduct, handling and utilization of the gas after it passes the point of delivery shall be that of the consumer.*

(b) Although *the Company assumes no responsibility for the safe upkeep or operating conditions of any consumer's service line downstream of the point of delivery, ... the Company may refuse to turn on the gas to any consumer's premises until* all the consumer's pipes and appliances have been *tested and found to be* ... safe and free from leaks and *in good, safe, operating condition....*" (Emphasis supplied.)

Section 5 stands for the basic principle that the private property owner must maintain its private property, and the utility company is responsible for company property.

The weakness of Marco Crane's arguments is reflected in the following exchange between the commission's hearing officer and Marco Crane's president, Daniel Mardian:

"Q. Mr. Mardian, I just have two questions here. Other than the fact that the system operates within the trailer park, which I think has been marked Complainant's Exhibit No. 1, other than the fact that it is now a new system rather than the system that was installed when you first bought the trailer park, how was your position under the company's interpretation any different than it was prior to this whole dispute arising?

A. One, there are individual meters that the people all paid deposits (sic) and pay directly instead of paying to the trailer park, and two, I never liked the idea. I don't know anything about the gas lines. It scares me. We didn't want any of that.

Q. But that was the same situation. The latter one, whether one likes it or not, the responsibility of having to deal with gas equipment yourself, that was something that you had when you first bought the property.

A. Yes.

Q. I understand that you would like to get rid of that responsibility, but that has not changed under the company's interpretation of the situation, so the remaining difference would be that, rather than the customer paying you and you paying Southern Union, they pay Southern Union direct. Correct?

A. That's correct, they pay Southern Union directly. They don't pay Diamond T. They used to pay Diamond T."

Marco Crane contends that section 16(b) of the tariff mandates that Southern Union pay the cost of installing new lines because the applicants were the Diamond T residents and the company had the responsibility to install necessary facilities to provide gas to applicants for service. We do not agree. Section 16(b) states:

"(b) ... After receipt of the application [for service] the Company shall determine the extent of the facilities required to provide the service, the estimated cost of such facilities and the number of *potential* customers ... if a list of potential customers is furnished by the *initial applicant.* The design and resultant cost of facilities shall be based on the delivery of gas in the required volumes from the nearest adequate source in accordance with the Company's standard engineering and construction practices and *shall include mains.... Individual service lines* and customer metering and regulating equipment *shall not be included."* (Emphasis supplied.)

Subsection (b) specifically excludes the individual service lines (yard lines) that are involved in this dispute. Furthermore, as observed by the commission's decision, 16(b) would make no sense whatsoever if it were to be applied to a mere reconfiguration of existing customer service. It is designed to protect Southern Union customers from uneconomic extensions of gas service which would otherwise require significant cost subsidies from established operations. In effect, section 16 expresses the commission-approved policy that without the likelihood of additional customers, there would be no economic reason to extend the company's mains.

Marco Crane also asserts the applicability of section 16(c) and (d) of the tariff. Upon reading these sections it is clear that they apply only to new customers.

Marco Crane's next attack on the tariffs is that they are ambiguous and must be strictly construed against Southern Union. We do not agree. Marco Crane's argument here is reminiscent of the argument made by the pipeline in *Southern Pacific Pipe Lines, Inc. v. U.S. Department of Transportation,* 796 F.2d 539 (D.C.Cir.1986). There the Court stated at 542:

"Recognizing that its suggested construction strains the Act's language, petitioner describes the statute as ambiguous and urges us to seek guidance from the legislative history. In effect, petitioner is making a classic bootstrap argument by advancing a construction of the Act that renders it confusing and then using that confusion to justify avoiding the plain meaning axiom. We need not decide whether recourse to the legislative history is required here—whether the plain meaning rule applies—because even after examining that history we be-

lieve the agency's construction is reasonable."

In 1982 the commission adopted A.C.R.R. R14–2–305, which requires all new construction and/or extension of existing mobile home parks to be served with individual meters and not master meters. Marco Crane contends that if Southern Union's tariffs are interpreted to require Marco Crane to pay for the new gas facilities at Diamond T, the result would be a total frustration of the policy adopted by the commission to avoid the use of master meters. In addition, Marco Crane argues that it is unjust to require it to pay for the replacement of its deteriorated, privately-owned gas pipes when it is not receiving any revenue whatsoever in connection with the use of such facilities. We do not agree with these contentions. Marco Crane skips over the fact that this dispute arose a year before the master meter regulation was adopted. The replacement of Diamond T's service pipe lines did not involve the construction of a new mobile home park. The rule would only apply if it were an expansion of an existing mobile home park. Expansion is defined and limited to construction which has been started for additional permanent residents' spaces after the effective date of the rule. The effective date of the rule was March 2, 1982, nearly a year after the replacement of Diamond T's pipes. In addition, in the Diamond T situation, the replacement of existing pipes to serve existing trailer spaces was not construction for additional spaces. Moreover, the commission fully considered requiring conversion of existing master meter trailer parks when it drafted A.C.R.R. R14–2–305. Such a conversion policy was specifically rejected by the commission as being too expensive and inequitable.

Marco Crane launches a constitutional attack against the tariffs contending that if they are read to require it to pay for its replaced lines, the tariffs are discriminatory because existing customers are required to pay for replacement whereas new additional customers are not required to pay for installed lines. Marco Crane also contends that the construction given to the tariffs by the commission constitutes a tak-

ing of its property without payment or just compensation because "if Southern Union's tariffs are read to require Marco to pay for and own the new facilities, the Commission and superior court would, in effect, be requiring Marco to devote its property to a use for profit by Southern Union, but without any compensation to Marco." We find these arguments to be totally devoid of any merit.

The Arizona Constitution forbids discrimination by public utilities in rates, service, or facilities. Ariz. Const. Art. 15, § 12. A.R.S. § 40–334 states:

"A. A public service corporation shall not, as to rates, charges, service, facilities or in any other respect, make or grant any preference or advantage to any person or subject any person to any prejudice or disadvantage.

B. No public service corporation shall establish or maintain any unreasonable difference as to rates, charges, service, facilities or in any other respect, either between localities or between classes of service.

C. The commission may determine any question of fact arising under this section."

A public service corporation must treat all similarly situated customers alike. It cannot extend a privilege to one and refuse the same privilege to another. *People ex rel. Western Union Telegraph Co. v. Public Service Commission*, 230 N.Y. 95, 129 N.E. 220 (1920).

In *Town of Wickenburg v. Sabin*, 68 Ariz. 75, 200 P.2d 342 (1948), the court stated:

"A public service corporation is impressed with the obligation of furnishing its service to each patron at the same price it makes to every other patron for the same or substantially the same or similar service. It 'must be equal in its dealings with all.' It 'must treat the members of the general public alike.' ... There must be equality of rights to all and special privileges to none." (At 77, 200 P.2d at 343, citing McQuillin Munici-

pal Corporations, 2d Ed. Vol. 4, Section 1829.)

 It would be discriminatory and therefore unlawful for Southern Union to place Marco Crane in a better position than its other customers. This is precisely what Marco Crane wants when it argues it is entitled to a windfall by free replacement of its own deteriorated gas lines. Marco Crane's discrimination argument fades into the mist out of which it was conceived when it is remembered that if the system could have been repaired, Marco Crane clearly would have had to pay for the repairs.

The New Jersey Board of Public Utility Commissions dealt with a similar issue and found that the discriminatory allegations were baseless and contrary to public policy. In *Superior Propane Co. v. South Jersey Gas Company*, 60 P.U.R.3d 217 (N.J.1965), the petitioner had claimed that the new tariff charges were discriminatory because new customers did not have to pay for installation of gas lines while the existing customers had paid for pipe installation beyond 50 feet. The commission ruled that to adopt petitioner's theory would in effect freeze all such tariff provisions. To thwart a public utility from liberalizing the conditions under which utility service can be supplied to new customers is adverse to public interest.

Marco Crane argues that making it pay for the new lines and giving it ownership of such new lines constitutes a taking because it gets no value from such lines, whereas Southern Union derives revenues from the gas flowing through the lines to the trailer pads. We do not agree. Marco Crane has received a benefit from the replacement of its leaky, deteriorating and privately-owned gas pipes. Such a capital investment increases the value of the trailer park. Furthermore, one can assume that a prudent trailer park owner would recoup such capital expenditures through rents for the use of the trailer spaces.

Marco Crane did not bear its burden of proof in the trial court. More than that,

Marco Crane's position, on its face, makes no sense.

Affirmed.

LACAGNINA, C.J., and LIVERMORE, J., concur.