107 P.3d 356

**GRAND CANYON TRUST; The Land and Water Fund of the Rockies, Plaintiffs–Appellants,**

v.

**ARIZONA CORPORATION COMMISSION, Defendant–Appellee,**

and

**Tucson Electric Power Company, Intervenor–Appellee.**

No. 1 CA–CV 04–0079.

Court of Appeals of Arizona, Division 1, Department D.

Feb. 22, 2005.

Review Denied June 28, 2005.

**32**

Arizona Center for Law in the Public Interest By Timothy M. Hogan, Phoenix, Attorneys for Plaintiffs–Appellants.

Arizona Corporation Commission Legal Division, By Christopher C. Kempley, Timothy J. Sabo, Janice Alward, Phoenix, Attorneys for Defendant–Appellee.

Roshka Heyman & DeWulf, PLC, By Raymond S. Heyman, Darlene M. Wauro, Phoenix, Attorneys for Intervenor–Appellee Tucson Electric.

**OPINION**

SNOW, Judge.

¶ 1 Plaintiffs–Appellants Grand Canyon Trust[1] and The Land and Water Fund of the

1. Grand Canyon Trust is a nonprofit organization based in Flagstaff, Arizona. Its goal is to protect the natural resources of the Grand Canyon and the Colorado Plateau.

2. The Land and Water Fund of the Rockies is a nonprofit regional environmental law and policy center dedicated to serving the Rocky Mountain States.

3. The Power Plant and Transmission Line Siting Committee of Arizona is established by the Com-

Rockies[2] (collectively "the Trust") appeal from the superior court's decision affirming a decision of the Arizona Corporation Commission ("the Commission") authorizing the construction of a fourth coal-powered electric generating unit at Tucson Electric Power's Springerville Generating Station. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶ 2 In 1986, Tucson Electric Power ("TEP") filed an application for a certificate of environmental compatibility ("CEC") so that it could construct a fourth electric generating unit at its existing Springerville Generating Station. In Arizona, prior to constructing a plant or transmission line, a utility must obtain a CEC from the Power Plant and Transmission Line Siting Committee ("the Siting Committee").[3] The CEC must be approved and promulgated in an order by the Commission. A.R.S. § 40–360.07(A) (2001).

¶ 3 In late 1986 the Siting Committee issued a CEC to TEP for the construction of Unit 4. The CEC was approved by the Commission in Decision No. 55477. As approved, the CEC was subject to several conditions, one of which required that, prior to undertaking any construction on Unit 4, TEP obtain from the Commission an order finding that the electricity to be produced by that unit was necessary to provide an " 'adequate, economical and reliable supply of electric power' to its customers all in accordance with the requirements of A.R.S. § 40–360.07(B)."

¶ 4 Fourteen years later, in 2001, TEP's parent company announced plans to begin construction on Units 3 and 4 at Springerville.[4] Grand Canyon thereafter filed with

mission pursuant to Arizona Revised Statutes ("A.R.S.") section 40–360.01 (2001). Its purpose is to review applications for the construction of transmission lines and plants, taking into account environmental factors in determining the suitability of the proposed site. A.R.S. § 40–360.06(A) (2001).

4. In 1977 TEP had obtained a CEC for the construction of Units 1, 2, and 3 at the Springerville site. By 2001, Units 1 and 2 had already been

the Commission a Motion to Rescind, Alter or Amend its decisions granting CECs for the construction of Units 3 and 4. Grand Canyon argued that, given the substantial amount of time that had passed since those CECs had been issued, the Commission should require TEP to file amended CEC applications reflecting current environmental factors. The moving party also argued that there was no need for Unit 4. TEP filed a Motion to Dismiss Grand Canyon's Motion to Rescind. It also filed an Application for Hearing to address "the issue of the need for a fourth generating unit" at the Springerville location.

¶ 5 TEP and Grand Canyon stipulated that the parties could address in a single hearing updated environmental impact data for Units 3 and 4 and the need for Unit 4. The Commission then conducted an evidentiary hearing over five days in November 2001 on the stipulated subjects. The Commission ultimately issued decision No. 65347 determining that "TEP ha[d] made the requisite showing of need for Unit 4" and that the "conditions contained in Commission Decision No. 55477 concerning the authority to construct Springerville Generating Station Unit 4 have been met."

¶ 6 In its decision, the Commission rejected Grand Canyon's argument that only TEP's retail customers should be considered in determining whether the output of Unit 4 was needed. But, the order did further condition the construction of Unit 4 on "firm wholesale contracts for the power output from Units 3 and 4 [being] in place prior to commencement of construction." Applications for rehearing were denied by operation of law. A.R.S. § 40–254(A) (2001).

¶ 7 Pursuant to A.R.S. § 40–254 the Trust filed an action in superior court to modify or set aside the Commission's decision. TEP intervened. The parties stipulated that, given the substantial evidentiary record developed in proceedings before the Commission, the action should be submitted to the superi-

or court on dispositive motions similar to appellate briefs. The superior court affirmed the Commission's decision and entered judgment in favor of the Commission and TEP, and the Trust timely appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(B)(2003).

## DISCUSSION

### A. Standard Of Review

■ ¶ 8 The Trust asserts that, because the superior court ruled against it as a matter of summary judgment, we must view all disputed issues of fact in its favor. *See Tonto Creek Estates Homeowners Ass'n v. Ariz. Corp. Comm'n,* 177 Ariz. 49, 55, 864 P.2d 1081, 1087 (App.1993) (citation omitted). That argument is correct only as to new evidence presented to the superior court.

¶ 9 The statute that provides for a challenge to a decision of the Commission in superior court specifies that the trial to be given such a challenge "shall conform, as nearly as possible, and except as otherwise prescribed by this section, to other trials in civil actions." A.R.S. § 40–254(C). However, one of the principal statutory exceptions to this right specifies: "In all trials, actions and proceedings the burden of proof shall be upon the party adverse to the commission ... to show by clear and satisfactory evidence that [the commission's order] is unreasonable or unlawful." A.R.S. § 40–254(E).

¶ 10 This provision mandates several departures from normal civil procedure. Not only does it mandate a higher burden of proof for the plaintiff than otherwise exists in an ordinary civil case,[5] but, because the plaintiff's burden of proof is to establish "in all proceedings" that the Commission's order is either unlawful or unreasonable, the superior court must evaluate the determinations already made by the Commission.

¶ 11 To be sure, "both the superior court and this court may depart from the Commis-

---

constructed, but construction on Unit 3 had not yet begun.

5. " 'Clear and satisfactory' [evidence] is the same as 'clear and convincing' [evidence]." This is a higher burden of proof than the "preponderance

of the evidence" standard which plaintiffs must meet in most civil cases. *Tucson Elec. Power Co. v. Arizona Corp. Comm'n,* 132 Ariz. 240, 243, 645 P.2d 231, 234 (1982).

sion's legal conclusions or interpretation of a statute and determine independently whether the Commission erred in its interpretation of the law." *Babe Invs. v. Arizona Corp. Comm'n,* 189 Ariz. 147, 150, 939 P.2d 425, 428 (App.1997) (citation omitted). However, when the plaintiff challenges a factual determination of the Commission, the superior court is not free to overturn it unless the plaintiff demonstrates by "clear and convincing" evidence that the Commission's determination is unreasonable. In making this assessment Arizona courts uphold such determinations if they are supported by substantial evidence. *Tucson Elec. Power,* 132 Ariz. at 243–44, 645 P.2d at 234–35 (court may disturb Commission's finding of fact only if it is not reasonably supported by evidence, is arbitrary or is otherwise unlawful); *Arizona Corp. Comm'n v. Citizens Util. Co.,* 120 Ariz. 184, 187, 584 P.2d 1175, 1178 (App.1978) (same). Such a review is very different from assuming that all facts alleged by the Trust are true. *Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Prods., Inc.,* 167 Ariz. 383, 387, 807 P.2d 1119, 1123 (App.1990) (citations omitted) ("In reviewing factual determinations, our respective roles begin and end with determining whether there was substantial evidence to support the administrative decision.... The question whether substantial evidence supports the state land commissioner's order does not raise material issues of fact; it presents a question of law.").

¶ 12 In an action challenging a Commission decision, the challenger may present evidence that was not presented to the Commission. *Arizona Corp. Comm'n v. Pac. Motor Trucking Corp.,* 116 Ariz. 465, 467, 569 P.2d 1363, 1365 (App.1977).[6] So long as the proferred evidence is admissible, and is uncontroverted, it is entitled to presumptions in favor of its truthfulness. *Eastwood Elec. Co. v. R.L. Branaman Contractor, Inc.,* 102 Ariz. 406, 410, 432 P.2d 139, 143 (1967); *Mortensen v. Knight,* 81 Ariz. 325, 305 P.2d 463, 464 (1956). However, the presumption of truthfulness that may attach to such new evidence does not change the nature of the superior court's inquiry or the

plaintiff's statutory burden of proof. The inquiry remains whether, even in light of the new evidence, there is substantial evidence supporting the Commission's decision. If so, the presumed truthfulness of the new evidence does not result in a modification of the Commission's order.

¶ 13 The parties here, by stipulation, submitted their appeal from the Commission's determination based on the record that was created in the Commission proceedings. *Tonto Creek Estates,* 177 Ariz. at 55, 864 P.2d at 1087. The Trust supplemented that factual record with the affidavit of SRP's Manager of Energy and Information, Charlie Duckworth, who described negotiations that were continuing between TEP and SRP on an amended joint development agreement and the likely terms of the amended agreement. Because the superior court resolved the action by motion, and the facts in the affidavit were not contested, we presume the truthfulness of the facts contained therein. We do not, however, presume the truthfulness of the Trust's factual allegations that were determined adversely to the Trust by the Commission. Instead, we determine, as presumably did the superior court, whether those determinations were supported by substantial evidence. Thus we evaluate the Commission's legal determinations *de novo,* and we review its factual conclusions to determine whether they are supported by substantial evidence taking into account any new uncontested evidence offered and assuming its truthfulness.

### B. The Merits

¶ 14 In its appeal, the Trust argues ·first that the superior court erred when it did not apply the legal standard set forth in A.R.S. § 40–360.07(B) to the Commission's proceedings. Second, it argues that when appropriate criteria are considered, there was not substantial evidence to support the Commission's decision that TEP had complied with the conditions in its 1986 CEC.

### 1. The Commission Applied A.R.S. § 40–360.07(B).

¶ 15 According to its plain terms, A.R.S. § 40–360.07(B) requires the Commis-

---

**6.** Although new evidence may be raised, new issues may not. A.R.S. § 40–253(C) (2001).

sion, upon a challenge to a decision of the Siting Committee concerning a CEC, to "balance, in the broad public interest, the need for an adequate, economical and reliable supply of electric power with the desire to minimize the effect thereof on the environment and the ecology of this state." The parties disagree about the extent to which A.R.S. § 40–360.07(B) governed the proceedings below. The Trust argues that the superior court held that the balancing was inapplicable to this action and such a holding is error. We do not read the superior court minute entry affirming the Commission's decision as holding that the balancing was not required in this case, but merely that it was not required by the statute governing the issuance of CECs. We agree with the superior court's reasoning in that regard.

¶ 16 The Trust argues on appeal as it did below that every applicant for a CEC must comply with the requirements of § 40–360.07(B). In this case, the Trust argues the Commission deferred compliance by placing the statutory requirement in the CEC and requiring that the statutory balancing occur shortly prior to construction. Even though this deferral amounted to more than fourteen years, the Trust argues that the requirement still must be met or the CEC is invalid. We reject this argument.

¶ 17 In interpreting statutory provisions we consider the individual provisions of a statute "in the context of the entire statute." *Burlington N. & Santa Fe Ry. Co. v. Ariz. Corp. Comm'n*, 198 Ariz. 604, 607, ¶ 15, 12 P.3d 1208, 1211 (App.2000); *Prudential v. Estate of Rojo–Pacheco*, 192 Ariz. 139, 148, 962 P.2d 213, 222 (App.1997) (reviewing specific statute in the context of its overall statutory scheme with the goal of achieving consistency among related provisions). By its

plain terms A.R.S. § 40–360.07 does not require that the Commission engage in the balancing specified by subsection (B) in every case. It only requires that the Commission do so when a party requests that the Commission review the Siting Committee's written decision concerning a CEC within fifteen days of its issuance.[7]

¶ 18 In this case, no party requested that the Commission review the Siting Committee's issuance of the CEC, and the Commission thus "affirmed and approved" the CEC subject to conditions without making the review in subsection (B). Thus, in this case, the statutory scheme does not require that the Commission balance need against minimizing environmental costs, and the superior court was correct in so concluding.

¶ 19 However, even if the statute did not require that the balancing occur, one of the conditions placed in the CEC itself did require the statutory balancing. TEP argues, however, that because the hearing was for the Commission to ascertain whether TEP had complied with the condition placed in the CEC by the Commission, we should give the Commission's interpretation of its own condition great deference. That is only partly correct. The condition at issue here contained two requirements. First, it required that the power generated by Unit 4 be "necessary ... for [TEP] to provide an 'adequate, economical and reliable supply of electric power' to its customers." Second, the Siting Committee required that TEP's construction of Unit 4 be "in accordance with the requirements of A.R.S. § 40–360.07(B)."[8]

 ¶ 20 The first requirement was imposed by the Commission without incorporating external standards. Thus, we defer to the Commission's interpretation of its own

---

7. The factors the Siting Committee must consider in deciding whether to issue a CEC are set forth in A.R.S. § 40–360.06. These factors contain sufficient breadth to allow the Siting Committee to consider the need for power as a factor in considering a CEC application should it choose to do so. The statute also allows the Siting Committee to "impose reasonable conditions upon the issuance of a" CEC. A.R.S. § 40–360.06(A).

8. The condition required:

[T]hat the Applicant obtain from the Arizona Corporation Commission ..., within one year prior to Applicant undertaking any preparatory engineering, design or construction efforts pertaining to Unit No. 4, an order, pursuant to hearing, confirming that the electric energy to be produced by Unit No. 4 is necessary in order for the Applicant to provide an "adequate, economical and reliable supply of electric power" to its customers, all in accordance with the requirements of A.R.S. § 40–360.07(B).

requirement unless that interpretation is clearly erroneous. *Marco Crane & Rigging v. Ariz. Corp. Comm'n,* 155 Ariz. 292, 294, 746 P.2d 33, 35 (App.1987) (deferring to interpretation of Commission-approved tariffs); *MCI Worldcom Network Servs., Inc. v. FCC,* 274 F.3d 542, 547 (D.C.Cir.2001) (stating that the court will allow an agency's interpretation of the intended effect of its own order to control unless clearly erroneous).

¶ 21 However, the second requirement, that the power be necessary "in accordance with the requirements of A.R.S. § 40–360.07(B)," incorporated a statute into the condition. In such a case, the deference the Commission is otherwise due is limited by the requirements of the statute. *Babe Invs.,* 189 Ariz. at 150, 939 P.2d at 428 (courts "determine independently whether the Commission erred in its interpretation of the law"); *Navajo County v. Prop. Tax Oversight Comm'n,* 203 Ariz. 491, 494, ¶ 8, 56 P.3d 65, 68 (App.2002) (same). Further the Commission's incorporation of A.R.S. § 40–360.07(B) as a condition in the CEC requires TEP to establish compliance with the statutory balancing even though it would not have been required to do so by the statute alone.

¶ 22 In this case, however, the Commission decision itself states that "[i]n arriving at its Decision herein, the Commission has balanced, in the broad public interest, the need for an adequate, economical and reliable supply of electric power with the desire to minimize the effect thereof on the environment and ecology of the state." This is the precise balancing required by A.R.S. § 40–360.07(B). Thus, the Commission applied the appropriate balancing and we do not read the superior court's decision as holding that such balancing was not required.

### 2. The Commission Did Not Err in Considering TEP's Wholesale Customers.

¶ 23 The Commission in its order both found as a matter of fact, and concluded as a matter of law, that TEP's customers included wholesale power customers. The Trust argues that the Commission erred in doing so.

¶ 24 The Trust argues that in 1971, when the Siting Committee statutes were passed, the electric power utility industry was a regulated monopoly in Arizona. Under that monopoly, the Trust suggests, the "need" for power was defined by reference to the need for power of Arizona retail power consumers, not by utilities who would purchase power wholesale from an Arizona utility for sale to other consumers. Thus, the Trust argues, in 1987 when the Siting Committee required that the Unit be necessary to meet the needs of TEP's customers, it would not have meant the entities to which TEP sold power on a wholesale basis.

¶ 25 When in the 1990s the Commission adopted a regulatory model more oriented to competition, it increased the ability of electric utilities to produce power and sell it on a wholesale basis to other utilities. The new regulatory model increased the demand to produce power in Arizona that was not necessarily destined for Arizona users and distorted the concept of "customers" the Siting Committee intended to include in its original condition.

¶ 26 Even assuming, as the Trust argues, that a competitive market for power generation may increase the number and demand of TEP's wholesale customers, TEP witnesses testified at the Commission that it sold wholesale power even under the previous regulated monopoly model. In 1987, when the condition was placed in the CEC, wholesale customers accounted for twenty percent of TEP's revenues. Such customers included SRP, APS, Phelps Dodge, and others. TEP still sells to these and other customers.

¶ 27 Further, Steve Olea, Assistant Director of the Utilities Division of the Commission, testified that:

> [I]f you look at TEP as it really is, [as] a part of the integrated system in the southwest, and again, if you look at all their load, which includes retail, current, future, wholesale, current future and new, and you also consider ... that this Commission has passed competition rules, which means that they're going forward with competition on the generation side, then again, it's my opinion that TEP would need the output from Unit 4. And not only that TEP

would, but that the state would, and right now, the question is how much power does this state really need.

¶ 28 Thus Mr. Olea's testimony, in addition to the testimony provided by TEP, was that the power delivery system in the southwest is an integrated system in which utilities purchase power from each other.

¶ 29 To the extent that the definition of a TEP customer in the CEC condition is a matter of law,[9] the Commission itself placed the term in the CEC. We thus defer to the Commission's interpretation of the term unless it is clearly erroneous. *Marco Crane & Rigging,* 155 Ariz. at 294, 746 P.2d at 35 (deferring to interpretation of Commission-approved tariffs); *MCI Worldcom Network Servs.,* 274 F.3d at 547 (stating that the court will allow an agency's interpretation of the intended effect of its own order to control unless clearly erroneous). In light of the above considerations, the Commission's determination that wholesale power customers of TEP are included within its customers for purposes of establishing need is not clearly erroneous.

### 3. The Commission Did Not Abrogate Its Statutory Responsibilities.

¶ 30 The Trust next argues that the Commission failed to properly conduct the balancing required by A.R.S. § 40–360.07(B) as incorporated in the CEC. It argues that instead of the Commission independently determining that a need for power existed so that it could balance that need with the desire to minimize the environmental and ecological impact as the statute requires, the Commission merely imposed a requirement that TEP enter wholesale power contracts for the output of Unit 4 prior to construction. Citing this court's recent decision in *Phelps Dodge Corp. v. Arizona Electric Power Co-op., Inc.,* 207 Ariz. 95, 83 P.3d 573 (App. 2004), the Trust argues that this amounts to an abrogation of the Commission's independent responsibility to make a determination of the need for power.

¶ 31 The Trust also argues that because the Commission's determination of need relies upon the need for wholesale power, its determination is not supported by substantial evidence because the Commission has made no attempt to quantify the need for wholesale power within the state.

¶ 32 As an initial matter, we reject the Trust's assertion that the Commission made no independent finding of need. In Decision No. 65347 the Commission set forth, at some length, the analysis in which it balanced the need for power with the desire to minimize the environmental and ecological impacts necessary to obtain that power. In discussing the need for power, it first noted that it accepted Mr. Olea's testimony characterizing the nature of the Arizona power market and confirmed that "[a] wholesale customer needs power just as a retail customer needs power." It noted that placing Unit 4 where there were already existing coal-powered generating units would prevent the need for siting new or additional transmission facilities and would minimize the environmental impacts associated with placing a new power facility where none previously existed (a "greenfield" plant siting). It further determined that the increased emissions that might be expected from Unit 4 would be very minimal because, if Unit 4 were constructed, new emission control technology would be required for the existing units resulting in minimal additional emissions overall. The Commission then determined that "the environmental impacts of the proposed expansion do not outweigh the need for [an] adequate, economical and reliable supply of electricity in Arizona."

¶ 33 In its conclusions of law at the end of the order the Commission further determined that "TEP has made the requisite showing of need for Unit 4 pursuant to Decision No. 55477." It also states that, "[i]n arriving at its Decision herein, the Commission has balanced, in the broad public interest, the need for an adequate, economical and reliable supply of electric power with the

---

9. The Trust in its briefing acknowledges that TEP sells power to wholesale purchasers, and we do not understand the Trust to challenge the Commission's factual finding that TEP sells power to wholesale customers as lacking substantial evidence. There is, at any rate, substantial evidence in the record to support such a finding.

desire to minimize the effect thereof on the environment and ecology of the state." These conclusions belie the Trust's argument that the Commission has abrogated to the free market its responsibility to independently conduct the balancing of need for power with the environmental cost of obtaining it.[10]

■ ¶ 34 While the Commission did not, in its findings, precisely identify or quantify the nature of the need against which it then balanced the steps taken at the Springerville generating location to minimize environmental and ecological impacts, the subject of the hearing and the testimony presented concerned the need for the power to be produced by Unit 4. In this case, TEP presented testimony that its retail consumers alone would need the power to be generated by Unit 4. TEP representatives testified that it anticipated the need for approximately 320MW of additional capacity in 2005 and 631MW of additional capacity by 2010 to serve its retail customers. TEP witnesses also introduced testimony that its wholesale customers needed the power to be generated by Unit 4. These customers included SRP, APS, Phelps Dodge, other Arizona-based users and some external wholesale purchasers. The Commission also heard the evaluation of the Commission staff that, given the realities of power generation, there was a need within the state for the power to be generated by Unit 4. The Trust asserts that because the Commission relied on the need for wholesale power to determine the need for Unit 4, it was required to quantify the need for wholesale power within the state to provide substantial evidence to support its determination.

¶ 35 However, the statute itself does not require that the need for power be determined based solely on the power needs of in-state consumers. Nor is there anything in the statute that requires that the "need" for

the "adequate, economical, and reliable" power that is to be balanced against the desire to minimize environmental impacts should be determined in any particular way.[11] The statute gives the Commission the obligation to conduct the balancing in the broad public interest and leaves considerable discretion to the Commission in how to determine need under the statute. A.R.S. § 40–360.07(B). We cannot say that in an integrated wholesale market the need for wholesale power both in and out of the state will not affect the availability of power for consumers in Arizona. To this extent at least, we cannot say that it is irrelevant to the Commission's assessment of the broad public interest to take into account such considerations in the balancing it conducts pursuant to the statute. To the extent that an argument can be made that good public policy would dictate otherwise, that argument should be made to the legislature. *See Roosevelt Elem. Sch. District v. State,* 205 Ariz. 584, 591 ¶ 33, 74 P.3d 258, 265 (2003); *Schritter v. State Farm Mut. Auto. Ins. Co.,* 201 Ariz. 391, 394, ¶ 17, 36 P.3d 739, 742 (2001) ("The policy argument ... thus should be addressed to the legislature rather than to this court."); *see also State v. Cotton,* 197 Ariz. 584, 591, ¶ 26, 5 P.3d 918, 925 (App.2000) ("[P]olicy arguments are best addressed to the legislature, which is the appropriate forum for determining what, if any, reform is appropriate.").

¶ 36 The testimony introduced at the Commission hearing constitutes "substantial evidence" of the need for the power to be produced by Unit 4, and is sufficient to underpin the Commission's determination of need in balancing that need with the desire to minimize the environmental and ecological costs.

¶ 37 We also reject the Trust's assertion that the reasoning in *Phelps Dodge* supports

---

**10.** In addition to its finding that the power was needed, and that the need justified the environmental cost, the Commission imposed an additional requirement that the unit not be built in the absence of contracts for the power produced. Such a requirement, however, did not take the place of an independent determination of need; it merely provided a guarantee of the Commission's finding that there was a need for such power. As the Commission stated, "[t]he evi-

dence in the record that Unit 4 will not be built without firm contracts in place demonstrates that unneeded generation will not be built."

**11.** There was evidence offered at the hearing that the source diversity provided by a coal-powered generating station enhanced the ability within Arizona to produce a safe, stable and economic power supply.

its argument here. In *Phelps Dodge*, this court declared a Commission regulation, Ariz. Admin. Code R14–2–1611(A), unconstitutional. 207 Ariz. at 108, ¶ 39, 83 P.3d at 586. That regulation mandated that rates for power that resulted from the competitive market place "shall be deemed to be just and reasonable." *Id.* at 106, ¶ 27, 83 P.3d at 584. Because, however, the Arizona Constitution charges the Commission with setting just and reasonable rates, and because the Commission is required to consider all interests, including interests that may not be accounted for by the free market in doing so, we held that the regulation violated the constitution. *Id.* at 108, ¶ 39, 83 P.3d at 586.

¶ 38 The statute here, however, is distinguishable from the regulation we found unconstitutional in *Phelps Dodge*. While the statute here arguably requires the Commission to make a determination of the need for power just as the Arizona Constitution requires the Commission to set just and reasonable rates, there is nothing in the statute comparable to the invalidated administrative regulation that compels the Commission to accept market determinations of need. Nor, as we have observed, does the statute require the Commission to determine "need" in any particular fashion. The Commission thus may consider the market for power in determining the need for power, and it is difficult to imagine how the Commission could adequately assess the need for power without at least some reference to the market demand.[12]

¶ 39 We do not find that the Commission abdicated a statutory responsibility to the market in making its determination of need. We also find that determination to be adequately supported by substantial evidence.

### 4. The Need of SRP's Customers Was Not At Issue.

¶ 40 The Trust finally argues that any evidence of need presented by TEP is irrelevant due to the terms of an amended joint development agreement that TEP has entered with SRP pertaining to Unit 4. Under that agreement, the Trust asserts, TEP has transferred the exclusive right to construct Unit 4 to SRP and has superceded the joint development agreement between TEP and SRP that was in place at the time the Commission held the hearing. The amended joint development agreement, however, is not in the record. In their briefs the parties argue about the extent of the transferred right to construct Unit 4 and the interpretation of the amended development agreement. We cannot interpret a document that is not in the record. The Duckworth affidavit, while specifying the terms of the negotiation, makes clear that no agreement has yet been reached. Even accepting the Duckworth affidavit as true, the fact that negotiations are ongoing is not a sufficient basis on which to overturn the Commission's decision.

¶ 41 The question at issue before the Commission was whether TEP had met the conditions set forth in the CEC. The Commission's determination was that TEP had done so. That is the determination that the superior court reviewed. Events that occurred after the Commission hearing are not admissible evidence that the courts may consider. "[E]vidence of events occurring subsequent to the Corporation Commission hearing is not admissible." *Tucson Elec. Power*, 132 Ariz. at 244, 645 P.2d at 235. We, thus, decline to address such events here.

### 5. TEP Is Entitled To Costs But Not Fees.

¶ 42 TEP also requests attorneys' fees pursuant to A.R.S. § 12–348 (2003). Under that statute, "a court shall award fees and other expenses to any party other than this state or a city, town or county which prevails by an adjudication on the merits in ... [a] court proceeding to review a state agency decision pursuant to ... [a] statute authorizing judicial review of agency decisions." A.R.S. § 12–348(A)(2).

---

12. In *Phelps Dodge* we also noted that the determination of just and reasonable rates need not be totally separated from market forces. 207 Ariz. at 107, ¶ 32, 83 P.3d at 585. "Although the Commission may be influenced by market forces, in determining what rates are 'just and reasonable,' the Commission may not abdicate its constitutional responsibility to set just and reasonable rates by allowing competitive market forces alone to do so." *Id.*

■ ¶ 43 In interpreting a statute, the court's primary goal is to fulfill the purpose of the legislature. *State v. McDermott*, 208 Ariz. 332, 334, ¶ 5, 93 P.3d 532, 534 (App. 2004). That is most often accomplished by looking at the plain meaning of the words the legislature places in the statute. *Long v. Napolitano*, 203 Ariz. 247, 258, ¶ 37, 53 P.3d 172, 183 (App.2002) (citations omitted). When, however, the legislature specifies its purpose in the session law that contains the statute, it is appropriate to interpret the statutory provisions in light of that enacted purpose.[13]

¶ 44 While not codified with the statute, the legislation enacting A.R.S. § 12–348 set forth both legislative findings and a legislative purpose. 1981 Ariz. Sess. Laws, ch. 208, § 1. The legislative findings specified that there was a disincentive for private parties to challenge governmental action due to the disparity inherent between the parties. *Id.* The governmental agency has extensive resources available to it in defending its decisions while private parties generally have much more limited resources. *Id.* The legislative purpose was thus reducing "the deterrents and the disparity by entitling prevailing parties to recover an award of reasonable attorney fees, expert witness fees and other costs *against the state.*" *Id.* (emphasis added). Thus, the legislation interpreted as a whole does not authorize the court to require any entity other than a governmental entity to pay a fee award to the prevailing party. This conclusion is confirmed by the title of the statute which, in pertinent part, reads "Award of fees and other expenses against the state or a city, town or county." A.R.S. § 12–348. Although a title is not part of a law itself, we may look to it for guidance in interpreting a statute. *Pleak v. Entrada Prop. Owners' Ass'n*, 205 Ariz. 471, 474, ¶ 7, 73 P.3d 602, 605 (App.2003), *aff'd*, 207 Ariz. 418, 87 P.3d 831 (2004).

¶ 45 Further, when the governmental agency is the prevailing party, the statute makes no provision for the government to recover fees against the party challenging its decision. It would be inconsistent with the statutory purpose to expose the challenger to the risk of paying the agency's attorneys' fees if the challenger did not prevail. It would similarly be inconsistent with the statutory purpose to allow an attorneys' fees award to be made to private parties who intervene on the side of the state. In this case TEP intervened on the side of the Commission to defend the Commission's decision. While it was TEP's clear right to do so to defend its interests, it would be inconsistent with the statutory purpose to enter a fee award against the Trust and in favor of TEP for the reasons stated above. Thus, we conclude that A.R.S. § 12–348 does not authorize a fee award here.

¶ 46 TEP requests an award of costs pursuant to A.R.S. §§ 12–331 (2003) and 12–341 (2003). As a successful party, TEP is awarded its costs on appeal upon compliance with Arizona Rule of Civil Procedure 21.

## CONCLUSION

¶ 47 The Trust failed to prove by clear and convincing evidence that the Commission's decision was unlawful or unreasonable. The superior court's decision affirming the Commission ruling is therefore affirmed.

CONCURRING: PATRICIA K. NORRIS, Presiding Judge, and PATRICK IRVINE, Judge.

---

13. In such cases the statement of legislative purpose is itself enacted and is thus subject to the entire review process by which a bill becomes law. The statement is thus free from some of the vagaries that can otherwise accompany a judicial search for legislative intent.