NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

———————————————

PATRICK LEONARD SHUDAK, *Plaintiff/Appellant*,

*v.*

ARIZONA CORPORATION COMMISSION, *Defendant/Appellee*.

No. 1 CA-CV 15-0544
FILED 12-13-2016

———————————————

Appeal from the Superior Court in Maricopa County
No. LC2014-000492-001
The Honorable Crane McClennen, Judge (Retired)

**AFFIRMED**

———————————————

COUNSEL

Greenberg Traurig, LLP, Phoenix
By Brian J. Schulman, Nedda R. Gales
*Counsel for Plaintiff/Appellant*

Arizona Corporation Commission, Phoenix
By Ryan J. Millecam
*Counsel for Defendant/Appellee*

---

**MEMORANDUM DECISION**

Judge Samuel A. Thumma delivered the decision of the Court, in which Presiding Judge Patricia K. Norris and Judge Margaret H. Downie joined.

---

**T H U M M A**, Judge:

¶1        Patrick Shudak appeals from the superior court's decision affirming the Arizona Corporation Commission's (ACC) decision that Shudak violated the Arizona Securities Act and ordering him to pay restitution and administrative penalties. Because Shudak has shown no reversible error, the decision is affirmed.

## FACTS[1] AND PROCEDRAL HISTORY

¶2        From January 2008 until July 2009, Shudak offered, sold and transferred membership units in Parker Skylar & Associates, LLC (PSA) to various offerees in Arizona and elsewhere. Neither Shudak nor PSA were registered securities salespersons or dealers, *see* Arizona Revised Statute (A.R.S.) section 44-1941 (2016),[2] and the membership units transferred were unregistered, *see* A.R.S. §§ 44-1871, -1891. Promotional materials Shudak provided stated the funds invested would be used to purchase and develop real property. Shudak's representations, and documents he provided, to investors indicated funds invested in PSA would be used solely for that purpose. Notwithstanding these representations, Shudak transferred money invested in PSA to his personal account, to personal accounts belonging to others (including his girlfriend) and to accounts of various other businesses owned by or associated with Shudak.

¶3        Apart from these affirmative representations, Shudak did not disclose to investors that multiple creditors were suing him in various cases and that judgments had been entered against him. Shudak also failed to

---

[1] This court views the facts in the light most favorable to sustaining the ACC's decision. *Shorey v. Ariz. Corp. Comm'n*, 238 Ariz. 253, 255 ¶1 n.2 (App. 2015) (citing cases); *Hirsch v. Ariz. Corp. Comm'n*, 237 Ariz. 456, 458 ¶ 1 n.2 (App. 2015) (citing cases).

[2] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

disclose to investors that he had added his girlfriend (who was a co-defendant in some of the creditor lawsuits) as a co-signatory on PSA's accounts, despite the fact that PSA's operating agreement authorized the PSA manager (Shudak, at all times relevant here) as the sole signatory.

¶4  In mid-2008, Shudak secured a loan for PSA and, in return, granted the lender a security interest in all of PSA's assets *and* transferred a 20 percent interest in PSA to the lender. Almost immediately, the lender perfected its security interest. At the time of the loan, only three investors had invested. Shudak, however, did not inform those three investors, or any of the subsequent investors, about the loan, transfer or security interest.

¶5  By July 2009, Shudak had assigned 132.5 percent of the PSA membership units to various individuals or entities. Shudak did not, however, inform the investors of this oversubscription. And notwithstanding this oversubscription, Shudak then induced another individual to make an investment in exchange for a security interest in 50 percent of PSA.

¶6  By December 2009, investors had become concerned when Shudak stopped returning phone calls and failed to respond to requests for information. Given concerns Shudak had taken perhaps as much as $1,000,000 in investor funds, at the request of investors, on December 15, 2009, Shudak resigned as PSA manager and relinquished his PSA membership units. In April 2010, Shudak filed for bankruptcy.

¶7  After Shudak ended his affiliation with PSA, investors tried to salvage the project. However, in April 2013, the lender who received the security interest in all of PSA's assets in mid-2008 sued PSA, investors and others. In May 2013, a balloon payment came due on the seller's note for the real property. When the investors were unable to sell the real property to satisfy the balloon payment, it became subject to foreclosure. The record provided does not describe the ultimate disposition of the property.

**¶8** In September 2012, the ACC Securities Division (Division) filed a 14-page notice of opportunity for hearing (Notice) against Shudak and PSA,[3] alleging violations of the Arizona Securities Act (ASA), A.R.S. §§ 44-1801 to -2126. PSA did not appear or respond, a default was taken against it and PSA is not a party to this appeal. Shudak, however, filed a request for hearing.

**¶9** After motion practice and other proceedings, a three-day evidentiary hearing was held in June 2013 before administrative law judge (ALJ) Marc E. Stern. ALJ Stern received exhibits and testimony from three PSA investors, Division Certified Public Accountant Andrea McDermitt-Fields and Division investigator Dulance Morin. Shudak was represented by counsel, but elected not to attend the hearing, did not testify and called no witnesses to testify on his behalf, although he had the opportunity to do so. The parties then were allowed to file post-hearing briefs.

**¶10** Approximately a year later, noting a backlog of cases, the ACC's Chief ALJ appointed ALJ Belinda A. Martin to preside over the case. ALJ Martin wrote a 50-page recommended opinion and order (ROO). ALJ Martin reviewed the record from the evidentiary hearing, "consulted with ALJ Stern during her review of the record, [and] consulted with him if she had any questions" during that review and the writing of the ROO.

**¶11** After setting forth detailed factual findings, the ROO concludes the PSA membership units were securities under A.R.S. § 44-1801(26); Shudak "acted as a dealer and/or a salesman of securities" in connection with the PSA offerings under A.R.S. § 44-1801(22); Shudak failed to show that the securities were exempt from regulation under A.R.S. § 44-2003; the securities, which were not registered or exempt, were offered and sold in violation of A.R.S. § 44-1841; Shudak offered and sold unregistered securities within and from Arizona in violation of A.R.S. § 44-1842; Shudak (along with PSA) committed fraud in the offer and sale of unregistered securities, including making untrue statements and omitting material facts, in violation of A.R.S. § 44-1991; and Shudak controlled PSA within the meaning of A.R.S. § 44-1999 and was jointly and severally liable with PSA for violations of A.R.S. § 44-1991. The ROO recommended that the ACC

---

[3] The notice also named as an additional respondent Promise Land Properties, LLC (PLP), another Shudak entity. The ACC concluded PLP violated the ASA, representing grounds for a cease and desist order, and imposed restitution and an administrative penalty against PLP. PLP, however, is not a party to this appeal.

order Shudak to cease and desist from any future violations of the ASA, that his actions constituted multiple violations of the ASA and were grounds for restitution and administrative penalties and recommended that the ACC order Shudak to pay $1,996,500 in restitution (subject to any offset Shudak could show) and pay an administrative penalty of $150,000.

¶12        Shudak filed timely exceptions to the ROO. After an open meeting before the ACC, the ACC rejected Shudak's exceptions and unanimously adopted the ROO as written. After the ACC issued the opinion and order (Decision) in September 2014, Shudak unsuccessfully sought rehearing.

¶13        Shudak then timely challenged the Decision in superior court. **[Id.]** After full briefing and oral argument, the superior court affirmed the Decision. This court has jurisdiction over Shudak's timely appeal of the superior court's decision pursuant to A.R.S. §§ 12-913,[4] -2101(A)(1) and -120.21(A)(1).

## DISCUSSION

### I.    Standard Of Review.

¶14        In substance, Shudak presses three arguments: (1) no substantial evidence supports the Decision; (2) the restitution and administrative penalty imposed were "arbitrary and capricious, and contrary to law" and (3) the ACC violated Shudak's due process rights by adopting recommendations from an ALJ "who did not preside over" the evidentiary hearing, "and, therefore, did not observe witness testimony" and making findings "based on new fraud charges never litigated by the parties or disclosed before the hearing."

¶15        This court reviews the superior court's decision to "determine whether the underlying administrative decision of the Commission was illegal, arbitrary, capricious, or involved an abuse of discretion." *Shorey v. Arizona Corp. Comm'n*, 238 Ariz. 253, 257 ¶ 11 (App. 2015) (citations and internal quotations omitted). For factual challenges, this court's review is limited to whether there is substantial evidence in the record to support the finding. *Arizona Corp. Comm'n v. Pac. Motor Trucking*, 116 Ariz. 465, 467

---

[4] Notwithstanding its reference to "the supreme court," A.R.S. § 12-913 "has been construed as also allowing an appeal to the court of appeals, which was created after § 12-913 was enacted." *Svendsen v. Arizona Dept. of Transp., Motor Vehicle Div.*, 234 Ariz. 528, 533 ¶ 13 (App. 2014).

(App. 1977). This court independently reviews constitutional and legal arguments. *Webb v. State ex rel. Arizona Bd. of Med. Examiners*, 202 Ariz. 555, 557 ¶ 7 (App. 2002). With these standards in mind, the court addresses Shudak's arguments in turn.

## II.     Substantial Evidence Supports The Decision.

### A.     The Decision Properly Found The Offering Was Not Exempt From Registration.

¶16     Shudak argues the investments were part of a private offering and, accordingly, exempt from registration under A.R.S. § 44-1844(A)(1). Shudak argues the offering was exempt based on four factors: (1) the number of offerees; (2) the sophistication of offerees; (3) the size and manner of the offering and (4) the relationship of the offerees to the issuer. Shudak had the burden of proof to show the offering was exempt. *See* A.R.S. § 44-2033; *see also State v. Baumann*, 125 Ariz. 404, 411 (1980) ("there must be strict compliance with all the requirements of the exemption statute"). As noted above, however, Shudak did not testify and did not offer any affirmative testimony on his behalf. On this record, Shudak has not shown the ACC erred in determining that Shudak "had the burden of proving the applicability of an exemption, which he did not do." Nor has Shudak shown any legal error by the ACC in applying the factors he cites in determining the offering was not exempt from registration.

### B.     The Decision Properly Found Shudak Liable As A Control Person Of PSA.

¶17     Shudak argues the Decision improperly found him liable as a control person of PSA because PSA could not have been primarily liable for violating A.R.S. § 44-1991. The Decision found PSA "committed fraud in the offer and sale of unregistered securities, engaging in transactions, practices, or a course of business which involved untrue statements and omissions of material facts in violation of A.R.S. § 44-1991." PSA did not appeal from or challenge that finding, which is now final. Given that finding, Shudak cannot now argue that PSA could not be primarily liable for violating A.R.S. § 44-1991, meaning his control person argument fails.

### C.     The Decision Properly Found Shudak Violated The ASA.

¶18     Shudak argues the Decision improperly applied the ASA in various ways and erroneously found him in violation of the ASA. This court gives "great deference to the agency's interpretation and application of the statute[s]" it administers. *E. Vanguard Forex, Ltd. v. Arizona Corp. Comm'n*,

206 Ariz. 399, 410 ¶ 35 (App. 2003); *see also Baca v. Arizona Dept. of Economic Security*, 191 Ariz. 43, 46 (App. 1998) (noting an agency's interpretation of a statute or regulation it implements ordinarily is given great weight). "However, the agency's interpretation is not infallible, and courts must remain the final authority on critical questions of statutory construction." *U.S. Parking Systems v. City of Phoenix*, 160 Ariz. 210, 211 (App. 1989); *cf. Marco Crane & Rigging v. Arizona Corp. Comm'n*, 155 Ariz. 292, 294 (App. 1987) (judicial deference to ACC interpretation of rate schedules appropriate "where the decision is based upon reasonable interpretation"); *Arizona Water Co. v. Arizona Dept. of Water Res.*, 208 Ariz. 147, 154 ¶ 30 (2004) ("'[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.'") (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 838 (1984)).

¶19        The parties refer to "four frauds" claimed by the Division: (1) oversubscribing the offering; (2) mishandling and mismanaging investor funds; (3) failing to advise investors of the existence of a perfected security interest in PSA's assets; and (4) failing to advise investors of lawsuits and default judgments against Shudak and his other businesses. Shudak argues the Decision erroneously found that these four frauds were adequately supported by the evidence of record. The court addresses Shudak's arguments in turn.

¶20        Shudak argues "the evidence does not support the allegation that Shudak sold more than 100% of [PSA's] membership" units because he "only sold 88 membership units" in PSA in exchange for receipt of consideration. The record, however, shows that individuals "were being handed [PSA] membership units for bringing somebody in," even where they had not paid for those membership units. Although these recipients did not pay for these membership units, they were similar to the membership units provided to investors who had paid for their membership units. And "money is not always required as consideration." *Keg Restaurants Arizona, Inc. v. Jones*, 240 Ariz. 64 ¶ 43 (App. 2016). Finally, Shudak has not shown he could not be found to have committed fraud by distributing more than 100 percent of the membership units in PSA even if he received no consideration in return.

¶21        Shudak also argues that "the total number of units sold should be reduced even further" because one investor "received money back on several occasions." However, the record is clear that investors, including the one who received payments, were assigned an interest in the company that would be maintained "through the duration of land sales of

the entire 1,900-acre parcel." That one investor received some money back is immaterial to the amount of membership interests that were assigned to him.

¶22        Turning to mishandling and mismanaging investor funds, Shudak argues the Division was required to produce "substantial evidence of fraud with respect to *each* investor." The Decision clearly found that Shudak violated A.R.S. § 44-1991(A) in numerous ways and committed at least one act of fraud with each investor. The Decision does not find, and the Division does not argue on appeal, that there were four fraud violations for every investor. Moreover, Shudak has not shown that the loss causation concept his argument implicates applies in this enforcement action. *See Hirsch v. Arizona Corp. Comm'n*, 237 Ariz. 456, 462 ¶ 19 (App. 2015) (rejecting argument that "[b]ecause the Commission did not present proof of loss causation as to each of the 900 participants, . . . the Commission's conclusion that they violated the ASA and the corresponding imposition of administrative penalties were unsupported by evidence and therefore, legally erroneous"). Finally, to the extent this argument echoes his argument that the Decision was not supported by sufficient evidence, as discussed herein, there was ample evidence to support the fraud findings in the Decision.

¶23        Shudak argues there was no evidence he mismanaged funds. However, the Decision specifically found that Shudak commingled funds and added an unauthorized co-signatory contrary to PSA's Operating Agreement, which constituted fraud regardless of how the funds were used after they were commingled. Factually, the record amply supports this finding. Legally, this court gives great weight to the ACC's application of the ASA. *E. Vanguard Forex, Ltd.* 206 Ariz. at 410 ¶ 35. As set forth in the Decision, the ACC's interpretation of A.R.S. § 44-1991 as including commingling of funds and adding an unauthorized co-signatory is certainly reasonable. *Cf. Arizona Water Co.*, 208 Ariz. at 154 ¶ 30 (deferring to agency's reasonable interpretation of statute); *Arnold Const. Co., Inc. v. Arizona Bd. of Regents*, 109 Ariz. 495, 499 (1973) (refusing to accept agency's interpretation of a statute where it would result "in an absurdity which is not necessary under the purpose of the act nor required by a reasonable and fair construction of the wording of the statute"). Finally, given that the fraud finding did not turn on how the funds were used after they were commingled, Shudak's argument that the Division's "forensic accountant did not do any analysis on how the money was used" misses the mark.

¶24        Shudak argues there was no evidence that he failed to disclose that the private lender had perfected its security interest in all of PSA's

assets and that the lender deemed PSA in default of its loan obligations. It is true that three investors purchased their membership units before this loan was made. It is equally true, however, that written representations provided to investors, signed by Shudak, stated investors received the membership units "free and clear of any liens and encumbrances of any kind, character or nature and the Grantor, and its successors and assigns will forever warrant and defend the same against all lawful claims and demands whatsoever."

¶25         As to the investors who purchased their membership units after this loan, Shudak does not argue the evidence demonstrates he disclosed the existence of the loan, which had the very real possibility of eliminating the value of their investments in PSA. Shudak argues offering documents indicated he could borrow money on behalf of PSA, and investors represented "they had access to whatever information they deemed necessary and that they conducted their own due diligence." Shudak has not, however, shown any authority for the proposition that such representations mean, as a matter of law, that he could not have acted fraudulently for purposes of an enforcement action by failing to disclose to investors that he had encumbered PSA and that the lender had a perfected security interest in all of PSA's assets. Again, Shudak has failed to show the ACC improperly applied the ASA. *See E. Vanguard Forex, Ltd.*, 206 Ariz. at 410 ¶ 35. Moreover, Shudak's duties owed to investors "not only remove[] the burden of investigation from an investor, but places a heavy burden upon [Shudak] not to mislead potential investors in any way." *Trimble v. Am. Sav. Life Ins. Co.*, 152 Ariz. 548, 553 (App. 1986).

¶26         Shudak next argues "[t]here is no evidence" that he "represented to investors that he was qualified and had expertise and experience to raise capital sufficient" to fund the project or "that he failed to disclose to several investors that several of Shudak's creditors had sued him." To the extent this argument is premised on a requirement of proving lack of disclosure to all PSA investors (as opposed to all but three PSA investors), it fails for the same reasons set forth above. *See supra* ¶ 22. The record also supports the finding that Shudak represented to some investors "that he was capable of soliciting the capital needed to meet these obligations**."** The record includes a Statement of Financial Affairs in Shudak's bankruptcy, indicating 11 lawsuits were filed against him in 2008 and 2009. This evidence supports a finding that he knew about at least some of this litigation yet failed to disclose it to investors. On this record, Shudak has not shown the Decision was factually unsupported in this regard.

¶27        Finally, Shudak argues there is no evidence that he induced an Arizona couple to purchase a note in exchange for a 50 percent interest in PSA. Again, the record reveals otherwise. The record includes testimony about the note and documents addressing the note were received at the hearing. Shudak presented no controverting evidence. On this record, Shudak has not shown the Decision was unsupported by substantial evidence in this regard.

### D.     Shudak's Other Factual Challenges To The Decision Fail.

¶28        Shudak argues the ROO, which was prepared by ALJ Martin, "cannot be reconciled with ALJ Stern's comments at the hearing, let alone the evidence." Before the ACC issued the Decision, ALJ Stern responded to a similar argument by stating "things [Shudak claimed] are taken out of context or misread and misinterpreted." By issuing the Decision, the ACC accepted that explanation and, on this record, Shudak has not shown it was improper for the ACC to do so.

¶29        Noting Shudak "presented no defense," ALJ Stern stated that "the evidence wasn't terrible. The evidence was somewhat out of order." At that same time, ALJ Stern stated that the Division had the burden of proof by a preponderance of the evidence, that the Division met its burden of proof and that Shudak made a choice to "present[] no defense. So that's the way we awarded this." By preparing the ROO as it was later entered in the Decision, ALJ Martin clearly found the Division had met its burden and that Shudak had not successfully presented any defense. In short, Shudak has presented no statements by the ALJs that would show a lack of evidentiary support for the ROO or the Decision.

¶30        Shudak repeatedly, and relatedly, argues that the record is "devoid of evidence" to support various findings in the Decision, pointing out he did not testify and was not present at the hearing. As noted above, Shudak was given an opportunity to attend the hearing and could have testified. Instead, he elected to stay in Hawaii, where he was living at the time. The Decision outlines and addresses each of Shudak's arguments regarding the sufficiency of the evidence and finds that there was evidence supporting the allegations that the Decision sustained. Given the record, there is no meaningful benefit in restating here the factually supported and adequate findings in the 50-page Decision. Moreover, many of Shudak's arguments turn on reweighing the evidence, something this court will not do. *Nutek Info. Sys., Inc. v. Arizona Corp. Comm'n*, 194 Ariz. 104, 107 ¶ 15 (App. 1998) (noting this court does "not reweigh the evidence" and "will not substitute its judgment for that of the agency on factual questions or

matters of agency expertise"). This court has reviewed the record and found that it adequately supports the factual findings in the Decision. *See Gaveck v. Arizona State Bd. of Podiatry Examiners*, 222 Ariz. 433, 436 ¶ 11 (App. 2009). Nothing more is required.

## III. The Restitution And Administrative Penalty Imposed Were Proper.

**¶31** The Decision ordered Shudak to pay $1,996,500 in restitution, (subject to any offset Shudak could demonstrate) and pay an administrative penalty of $150,000. Shudak argues the restitution award was improper because: (1) no violations were proven; (2) his due process rights were violated and (3) the restitution amount was not supported by the evidence. As discussed above, Shudak's violations of the ASA were proven, and as discussed below, Shudak's due process rights were not violated. Similarly, Shudak has not shown the restitution amount was unsupported.

**¶32** Restitution "shall include" cash equal to the fair market value of the consideration paid at the date such payment was originally made, plus interest less the amount of distributions received on the security from the purchase date to the date of repayment. *See* Ariz. Admin. Code R14-4-308(C)(1). The $1,996,500 in restitution imposed is supported by record evidence, including Shudak's bankruptcy filing, bank records and other documentation. Accordingly, Shudak's lack of evidence argument fails. Moreover, the restitution imposed is a net amount, starting with a gross amount of $2,142,000 and, after accounting for a lack of supporting evidence for certain investments, yielding $1,996,500 plus interest. Finally, the Decision expressly provides that Shudak's restitution obligation is subject to any offset he could show, avoiding the potential windfall Shudak suggests. On this record, Shudak has not shown the restitution ordered was error.

**¶33** Shudak argues the administrative penalty of $150,000 was excessive because there is no evidence that he "committed 30 different violations." The ACC may impose administrative penalties "in an amount not to exceed" $5,000 "for each violation" of the ASA. *See* A.R.S. § 44-2036(A). The Decision found Shudak and PSA committed fraud with each offer and each sale, which the Division claims totals 90 fraud violations. In fact, given the "four frauds" discussed above, and the number of investors properly implicated by each of those frauds, the maximum penalty authorized under A.R.S. § 44-2036 far exceeded $150,000. Accordingly, Shudak has shown no error in the administrative penalty imposed by the Decision.

### III.    Shudak's Due Process Rights Were Not Violated.

¶34        Shudak argues his due process rights were violated because: (1) the ALJ who did not preside over the hearing wrote the ROO and (2) the ROO and Decision found fraud based on charges for which he did not have advance notice. The court addresses these arguments in turn.

#### A.    Because Credibility Was Not A Basis For The Decision, Shudak's Due Process Rights Were Not Violated By The Involvement Of Two ALJs.

¶35        Shudak argues allowing an ALJ who did not preside over the hearing to write the ROO, that was ultimately adopted by the ACC as the Decision, violated his due process rights. Shudak argues the procedure followed did not comply with applicable administrative rules, particularly where credibility is at issue. Again, this court owes deference to the ACC when it construes the administrative rules applicable here. *See Grand Canyon Trust v. Arizona Corp. Comm'n*, 210 Ariz. 30, 36 ¶ 20 (App. 2005) (stating this court will defer to ACC's interpretation of own rules unless "that interpretation is clearly erroneous").

¶36        By rule, the ACC has significant flexibility in determining how hearings and recommended decisions should proceed. Among other alternatives, a hearing may be held "before . . . one or more" ALJs. A.A.C. R14-3-109(A). Again by rule, "[i]n a proceeding heard by a Hearing Officer [ALJ], the Hearing Officer [ALJ] shall prepare his recommendation which may be in the form of an opinion and order, unless otherwise directed by the Commissioners." A.A.C. R14-3-110(B). And all such rules "shall be liberally construed to secure just and speedy determination of all matters presented to the Commission," and may be waived "[i]f good cause appears" when they do "not affect the substantial interests of the parties." A.A.C R14-3-101 (B). Here, as noted by the ACC's Chief ALJ during the open meeting, the change in ALJs "was purely a case-management decision" given "a backlog of securities cases that didn't have a ROO written."

¶37        Even if Shudak could show the ACC violated its own rules, Shudak would have to show that such a violation prejudiced him and violated his due process rights. *See Brown v. Arizona Dept. of Real Estate*, 181 Ariz. 320, 324 (App. 1995) (noting agency's violation of its rules was "hardly a model of efficient decision-making," but that appellant was required to show that such a violation caused him to lose a significant legal right rising to the level of a due process violation). Thus, notwithstanding Shudak's

argument that the ACC violated applicable rules, given the discretion vested in the ACC to administer those rules, Shudak's argument turns on whether he was deprived his due process rights.

**¶38** Contrary to Shudak's argument, the ROO and Decision did not turn on credibility and Shudak's "substantial interests" were not affected by the involvement of two ALJs. ALJ Stern, who presided over the evidentiary hearing, expressly stated during the open meeting that there "was nothing in that hearing that would give us cause to question the credibility of the witnesses." ALJ Stern added that no competing witnesses were offered to challenge credibility. Nor is there any suggestion from the ROO that credibility formed the basis for ALJ Martin's recommendation. In oral argument before this court, Shudak asserted that credibility was brought into issue at the hearing in the form of cross-examination and because there was "conflicting testimony." It is true that the testimony of the investor witnesses differed. However, Shudak is conflating "different" with "conflicting." Shudak has not shown that because investors had factually different stories about their own circumstances, these immaterial differences directly, or even indirectly, contradicted each investor's testimony that Shudak offered and sold them securities.

**¶39** Shudak's counsel cross-examined an investor about why he was in the hospital when he met Shudak because "the reasons why he was in outpatient goes to the credibility of the witness." However, ALJ Martin allowed the questioning and decided the questioning did not put the investor's credibility at issue. Moreover, the Decision did not turn on one investor's memory of how he met Shudak.

**¶40** Finally, notwithstanding Shudak's arguments, ACC Commissioners typically do not preside over evidentiary hearings, even when credibility is at issue, but are always the final decision-makers. *See* A.R.S. § 41-1092.08(B); *cf. Ritland v. Arizona State Bd. Of Med. Examiners*, 213 Ariz. 187, 191 ¶ 12 (App. 2006) (holding "because the Board, and not the ALJ, issues the final administrative decision, the Board is not bound by the ALJ's findings of fact, including those related to credibility"). Thus, the record does not support Shudak's assertion that "[w]itness credibility and demeanor were critical parts of the Division's case."

**¶41** In oral argument before this court, Shudak urged a definition of credibility from *Ohlmaier v. Indus. Comm'n of Arizona*, "in the larger sense," as including "anything which throws light on the accuracy, truthfulness, and sincerity of the witness." 161 Ariz. 113, 118 (1989). Even accepting this definition, Shudak has not shown that credibility, in either a

more typical sense or in this "larger sense," was at issue in the hearing. *Ohlmaier* does state that a single finder of fact "shall hear all conflicting evidence which may form the basis of a contested industrial award." 161 Ariz. at 115. However, unlike *Ohlmaier*, in this case, there was no conflicting evidence implicating credibility. Indeed, *Ohlmaier* was careful to state that it was not implying that "all testimony must be heard 'live.' In some cases necessity dictates a different approach." *Id.* at 118.

¶42 In asserting a denial of due process, Shudak relies almost exclusively on *Adams v. Indus. Comm'n of Arizona*, 147 Ariz. 418 (App. 1985). In that case, a substituted ALJ, who did not observe testimony, reversed a workers' compensation award, noting medical evidence of the claimed injury was "so weakened by lack of a credible factual background as to be insufficient to support a compensable award." *Id.* at 419. *Adams* held that such a decision was error because, unlike this case, the ALJ's decision turned on credibility and "the credibility of the claimant was central to the determination." *Id.* at 422. Further, *Adams* qualified that holding by recognizing "that where final administrative decisions are made by agency boards or commissions, the commissioners themselves need not personally observe the witnesses." *Id.* at 421 n.1.

¶43 *Adams* is distinguishable. Over a three-day hearing, the Division called five witnesses, two of whom were Division employees. The testimony of each witness was corroborated by documentary evidence. Shudak did not call any witnesses nor did he present any evidence addressing credibility determinations. Further, ALJ Stern made plain that nothing received at the evidentiary hearing gave any "cause to question the credibility of the witnesses." *See also Carbo v. United States*, 314 F.2d 718 (9th Cir. 1963) (holding there was no due process violation where successor judge studied the record and concluded "that the corroboration [the witnesses] received from other convincing evidence placed the government's case safely beyond demeanor impeachment and that [the original judge] himself had not been disturbed by questions of credibility"). In addition, the ACC (not the ALJ) entered the Decision. *See Adams*, 147 Ariz. at 421 n.1. Because the evidentiary record resulting in the ROO, that the ACC then adopted in the Decision, did not turn on credibility, *Adams* does not show Shudak's due process rights were violated.

¶44 The ACC relies on *Pine-Strawberry Imp. Ass'n v. Arizona Corp. Comm'n*, 152 Ariz. 339 (App. 1986), for the proposition that an administrative agency may substitute ALJs without violating due process. In *Pine-Strawberry*, the ACC increased water rates and, after a hearing, a different hearing officer wrote a proposed order. *Id.* at 340. On appeal, the

court held that, because the second ALJ "had the benefit of the recorded testimony," that process "was sufficient to comply with due process requirements." *Id.* Although Shudak correctly notes *Pine-Strawberry* was not an enforcement case, he has not shown how that distinction means this analysis does not apply here. As in *Pine-Strawberry*, the ACC directed an ALJ to prepare an order and credibility was not at issue. Accordingly, *Pine-Strawberry* demonstrates Shudak's due process rights were not violated.

**¶45**   The ACC was not bound to accept the ROO and could have accepted it (as it did here) or accepted it in part or rejected it. As noted in *Ohlmaier*, "members of the commission who do not hear the testimony at the evidentiary hearing, but review the transcribed testimony thereof, may vote nonetheless and no right has been violated." 161 Ariz. at 118. Shudak expressed his concerns to the ACC at the open hearing, and the ACC could have refused to adopt the ROO. Instead, the ACC rejected Shudak's argument and entered the Decision. Accordingly, Shudak has not shown that his due process rights were violated based on the involvement of two different ALJs.

### B. Because Shudak Had Proper, Timely Notice Of All Charges Against Him, His Due Process Rights Were Not Violated.

**¶46**   Shudak argues his due process rights were violated because the ACC issued "a Decision that adopted new fraud charges . . . that were neither identified in the Notice nor argued by the parties during the hearing." More specifically, Shudak argues his adding a co-signatory to PSA's bank account and commingling funds did not constitute mishandling and mismanaging investor funds. This, Shudak argues, violated his due process rights.

**¶47**   One of the "four frauds" alleged was mishandling and mismanaging investor funds. Based on the record, the Decision concluded "that commingling investor funds with non-investor funds, and allowing a person to have access to investor funds who was not a PSA officer and who had a dubious financial background, constitutes misuse and mishandling of investor funds" and that such conduct also "constitutes an omission of a material fact in violation of the anti-fraud provisions" of the ASA. Clearly, Shudak had notice of the allegations that he had mishandled investor funds and that he had omitted material facts. Thus, the finding that he commingled funds and improperly added a co-signatory to PSA's accounts constituted one of the "four frauds" alleged by the Division long before the hearing.

**¶48** The evidence received at the hearing, which was disclosed to Shudak before the hearing, supports the finding that Shudak misused investor funds and added his girlfriend as a co-signatory to the account. Shudak argues that "[n]one of the witnesses were asked about signatories on the account or the alleged commingling of funds, because that was not a basis for the Division's securities fraud claim." The record, however, is to the contrary. The Division's forensic accountant testified about the commingling of funds and supporting bank documents that were admitted into evidence. In addition, Shudak did not object to bank signature cards, which contained his girlfriend's name as a signatory. Shudak cannot now assert that the allegations leading to the findings in the Decision were a surprise.

**¶49** Shudak had proper notice of the allegations against him and an opportunity to be heard. On this record, Shudak has not shown that his due process rights were violated. *See Mathews v. Eldridge*, 424 U.S. 319, 349 (1976) (defining due process as notice and an opportunity to be heard; noting due process has been provided where agency's "procedures not only provide the claimant with an effective process for asserting his claim prior to any administrative action, but also assure a right to an evidentiary hearing, as well as to subsequent judicial review").

## CONCLUSION

**¶50** Shudak has not shown the Decision was "illegal, arbitrary, capricious, or involved an abuse of discretion." *Shorey*, 238 Ariz. at 257 ¶ 11. Accordingly, the Decision is affirmed. In addition, because Shudak is not the prevailing party, his request for attorneys' fees on appeal pursuant to A.R.S. §§ 12-348(A)(2) and 41-1007, as well as his costs on appeal, is denied.



AMY M. WOOD • Clerk of the Court
FILED: AA