NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

WARREN WOODWARD, *Appellant,*

*v.*

ARIZONA CORPORATION COMMISSION, *Appellee,*

ARIZONA PUBLIC SERVICE COMPANY, *Intervenor.*

Nos. 1 CA-CC 17-0003
1 CA-CC 17-0004
(Consolidated)
FILED 12-11-2018

Arizona Corporation Commission
Nos. E-01345A-16-0036
E-01345A-16-0123

**AFFIRMED**

APPEARANCES

Warren Woodward, Sedona
*Appellant*

Arizona Corporation Commission, Legal Division, Phoenix
By Maureen A. Scott, Wesley C. Van Cleve, Naomi E. Davis,
Stephen J. Emedi
*Counsel for Appellee, Arizona Corporation Commission*

Pinnacle West Capital Corporation Law Department, Phoenix
By Thomas A. Loquvam, Thomas L. Mumaw, Melissa M. Krueger
*Counsel for Intervenor, Arizona Public Service Company*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge James P. Beene and Judge James B. Morse Jr. joined.

---

**B R O W N**, Judge:

¶1    This is a consolidated appeal of two Arizona Corporation Commission decisions that together enact a settlement agreement concerning Arizona Public Service Company's ("APS") 2016 rate case. Appellant Warren Woodward, an intervenor in the rate case, challenges Decision No. 76295's resolution enacting section 19.1 of the agreement ("choice of rate/90-day trial") and Decision No. 76374, which enacts section 30 of the agreement ("AMI[1] Opt-Out Program"). Because Woodward has not demonstrated that the Commission's decisions were unlawful, unreasonable, or unsupported by substantial evidence, we affirm.

**BACKGROUND**

¶2    APS is a public service corporation within the meaning of Article 15, Section 2, of the Arizona Constitution and is the largest provider of electricity in Arizona. As a public service corporation, APS is regulated by the Commission, which determines the rates APS can implement through a proceeding called a rate case. *See* Ariz. Admin. Code ("A.A.C.") R14-2-103. These proceedings are complex and often take more than a year to complete because they "attract many intervenors, require voluminous and detailed filings, and involve multiple, lengthy hearings." *Residential Util. Consumer Office v. Ariz. Corp. Comm'n*, 240 Ariz. 108, 110, ¶ 6 (2016).

¶3    Woodward is one of many intervenors to the 2016 rate case, which included various issues that were heavily litigated for over a year until 29 of 39 parties signed the settlement agreement at issue in this case.

---

[1]    AMI stands for Automated Meter Infrastructure and refers to the use of "smart meters," which are utility meters that have "have a two-way communication function between the utility company and the customer." Office of Envtl. Health, Ariz. Dep't of Health Servs., *Public Health Evaluation of Radio Frequency Exposure from Electronic Meters* 1 (2014).

Woodward was involved in the settlement agreement negotiations but opposed its final terms.

¶4          Whether the settlement agreement resulted in rates that were just, reasonable, and in the public interest was the subject of a seven-day evidentiary hearing before an administrative law judge ("ALJ") of the Commission's Hearing Division. Pre-filed testimony was admitted as evidence, and all 39 parties were permitted to submit direct and rebuttal testimony related to the settlement agreement and closing briefs at the hearing's conclusion. After the hearing, the ALJ reviewed the evidence and issued a recommended opinion and order ("ROO") that addressed all the disputed issues except the AMI Opt-Out Program, which was bifurcated for a separate decision.

¶5          At an open meeting, the Commission discussed the ROO and heard additional testimony before approving it, with several amendments, by a four to one vote. Decision No. 76295 was issued shortly thereafter, substantively adopting the ROO and concluding, in relevant part, that "the rates, terms and conditions of the Settlement Agreement are just, fair, and reasonable and in the public interest." Woodward filed an application for rehearing, which was denied by operation of law. *See* Ariz. Rev. Stat. ("A.R.S.") § 40–253(A) ("If the commission does not grant the application [for rehearing] within twenty days, it is deemed denied."). Woodward timely appealed the decision pursuant to A.R.S. § 40–254.01.

¶6          At a subsequent open meeting, the Commission discussed the ROO for the AMI Opt-Out Program and heard additional testimony before approving it with no amendments, by a vote of four to one. The Commission then issued Decision No. 76374, adopting the AMI Opt-Out Program and determining that the settlement agreement was just, reasonable, and in the public interest. Woodward filed an application for rehearing, which was denied by operation of law, and timely appealed the decision under § 40–254.01. We granted the Commission's motion to consolidate the two appeals and APS's motion to intervene.

**DISCUSSION**

¶7          The Commission "is a constitutional body . . . ow[ing] its existence to provisions in the [state's] organic law." *Ethington v. Wright*, 66 Ariz. 382, 389 (1948); *see also* Ariz. Const. art. 15, §§ 1–19. The Arizona Constitution grants the Commission "full power to . . . prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the

state for service rendered therein." Ariz. Const. art. 15, § 3. When exercising its constitutionally granted powers, the Commission has broad discretion. *See Residential Util. Consumer Office*, 240 Ariz. at 111, ¶¶ 11–12 (citations omitted).

**¶8** We review the constitutional and statutory challenges in this case de novo. *Id.* at ¶ 10. When reviewing a rate-making decision we "presume the Commission's actions are constitutional, and we uphold them unless they are arbitrary or an abuse of discretion." *Id.* For factual findings, we defer to the Commission unless presented with "a clear and satisfactory showing that [an] order is unlawful or unreasonable."[2] A.R.S. § 40-254.01(A), (E). This standard requires the party opposing a decision to "demonstrate, clearly and convincingly, that the Commission's decision is arbitrary, unlawful or unsupported by substantial evidence." *Freeport Minerals Corp. v. Ariz. Corp. Comm'n*, 244 Ariz. 409, 411, ¶ 6 (App. 2018) (citation omitted). We review only those issues that were fairly presented to the Commission in a timely application for rehearing. *See* A.R.S. § 40-253.[3]

---

[2] We disagree with the Commission's assertion that Woodward has the burden of "show[ing] by clear and convincing evidence" that the findings of fact are unlawful, unreasonable or unsupported by substantial evidence. Although "clear and satisfactory" has been interpreted as equivalent to "clear and convincing," *Consol. Water Utils., Ltd. v. Ariz. Corp Comm'n*, 178 Ariz. 478, 481 (App. 1993), under § 40-254.01(A) Woodward must make a clear and convincing *showing*. To meet this standard, he must provide (1) analysis of pertinent legal authorities sufficient to show the Commission's decisions are unlawful or unreasonable or (2) discussion of the evidence, with supporting record citations, sufficient to demonstrate the Commission's decisions are not supported by substantial evidence. Woodward is not allowed, much less required, to present evidence on appeal. *See Consol. Water Utils.*, 178 Ariz. at 481 (explaining that § 40-254.01 was adopted to make rate-case challenges much more efficient and that they are to "conform, as nearly as possible, to the manner in which other appeals are undertaken").

[3] Although Woodward's appellate briefing does not comply with Arizona Rule of Civil Appellate Procedure 13, his lack of compliance does not prevent us from deciding the merits of the issues properly preserved in his applications for rehearing and sufficiently developed on appeal.

## I.  Decision 76295: Choice of Rate/90-Day Trial Period

¶9        Woodward argues that the Commission exceeded the bounds of its prescribed power when it approved the choice of rate/90-day trial period found in § 19.1 of the settlement agreement, which provides as follows:

> All customers may select R-Basic, R-Basic Large, TOU-E, R-2, R-3, R-Tech or R-XS if they qualify until May l, 2018, except to the extent grandfathered under other sections of this Settlement Agreement.[4] Distributed Generation customers will not be eligible for R-XS, R-Basic or R-Basic Large. After May l, 2018, R-Basic Large will no longer be available to new customers or customers who are on another rate. New customers after May 1, 2018 may choose TOU-E, R-2, R-3 or if they qualify, R-XS or R-Tech. After 90 days, new customers may opt-out of their current rate and select R-Basic if they qualify. Customers transitioning to R-Basic must stay on that rate for at least 12 months.

¶10        Woodward asserts that § 19.1 must be set aside because grandfathering the R-Basic Large rate plan and requiring new customers to participate in the 90-day trial period constitute "facilitation of illegal discrimination," which is "both unlawful *and* unreasonable."[5] Woodward correctly states that the Commission is constitutionally required to set "just and reasonable" rates as well as rates that are not "discrimina[tory] in charges, service, or facilities . . . between persons or places for rendering a like and contemporaneous service." Ariz. Const. art. 15, §§ 3, 12. However, he has not made the requisite showings under either argument.

### A.  Just and Reasonable Rates

¶11        Just and reasonable rates are "fair to both consumers and public service corporations," *Phelps Dodge Corp. v. Ariz. Elec. Power Coop., Inc.*, 207 Ariz. 95, 106, ¶ 30 (App. 2004) (citations omitted), because public

---

4        The Commission approved § 19.1, but changed "the sunset for R-Basic Large" to September 1, 2018 because "there is sufficient evidence in the record and it is in the public interest for existing customers to have additional time to adequately consider the R-Basic Large plan."

5        Woodward arguably did not preserve this argument in his application for rehearing; we address it merely to clarify the meaning of "just and reasonable."

service corporations are "entitled to a fair return on the fair value of [their] propert[y] devoted to the public use," *Ariz. Corp. Comm'n v. Ariz. Water Co.*, 85 Ariz. 198, 203 (1959) (citations omitted). In determining whether rates are just and reasonable, we analyze the dollar amount of the rates as they relate to the fair value of the public utility's property. *See Simms v. Round Valley Light & Power Co.*, 80 Ariz. 145, 151 (1956) ("It is clear . . . that under our constitution as interpreted by this court, the commission is required to find the fair value of the company's property and use such finding as a rate base for the purpose of calculating what are just and reasonable rates."). Woodward's argument does not challenge the dollar amount of the rates; thus, we do not address whether the rates are "just and reasonable."

### B. Non-discriminatory Rates

¶12 Article 15, Section 12's prohibition on rate discrimination is applied to public service corporations in A.R.S. § 40-334.[6] This statute prohibits public service corporations from "mak[ing] or grant[ing] any preference or advantage to any person or subject[ing] any person to any prejudice or disadvantage," in regards to its "rates, charges, services, facilities or in any other respect." § 40-334(A). The Commission is given the power to "determine any question of fact arising under this section." § 40-334(C).

¶13 Woodward first argues that APS must make R-Basic Large available to—or take it away from—all of its residential customers because "deny[ing] a rate plan to some residential customers while other residential customers enjoy it is obvious illegal discrimination per A.R.S. § 40-334.A." In *Town of Wickenburg v. Sabin*, 68 Ariz. 75, 77 (1948), our supreme court noted that "the law on discrimination as applied to public service corporations generally is well-settled." The court explained how a public service corporation can avoid acting in a discriminatory manner:

'The charges must be equal to all for the same service under like circumstances. A public service corporation is impressed with the obligation of furnishing its service to each patron at the same price it makes to every other patron for the same or

---

6 The parties dispute whether the Commission can be found to have violated § 40-334 by approving discriminatory rates. We conclude that the Commission cannot per se violate this statute, but if its findings of fact are challenged and proven unlawful, unreasonable, or unsupported by substantial evidence, we have the authority to determine it has violated its constitutional duty under Article 15, Section 12.

substantially the same or similar service' . . . 'The common law upon the subject is founded on public policy which requires one engaged in a public calling to charge a reasonable and uniform price to all persons for the same service rendered under the same circumstances.'

*Id.* at 77–78 (quoting 4 Eugene McQuillin, *Municipal Corporations* § 1829 (2d ed. 1943)). Relying on *Wickenburg*, this court has further described the non-discrimination doctrine as the "obligation of a public service corporation to provide impartial services and rates to all its customers similarly situated." *Miller v. Salt River Valley Water Users' Ass'n*, 11 Ariz. App. 256, 260 (1970) (citation omitted).

**¶14**        The record supports the Commission's finding that APS is not acting in a discriminatory manner by removing R-Basic Large from its list of offerings. This conclusion would be different if APS were to offer new and existing customers the option to choose R-Basic Large at a higher or lower rate than current customers, but this is not the case. Here, new and existing customers who have not chosen—or do not choose before the sunset date—the R-Basic Large plan, are similarly situated with each other; they are not similarly situated with current R-Basic Large customers. Thus, § 19.1 does not result in discriminatory services or rates between similarly situated customers.

**¶15**        Woodward also asserts that the 90-day trial period makes or grants a preference or advantage to existing customers in violation of § 40-344(A). New customers, however, will pay the same amount for their rates as existing customers and will have access to all the same plans (unless grandfathered before the end of their trial period). Furthermore, Woodward acknowledges that even existing customers will be treated as new customers if they open services at a new residence.

**¶16**        Finally, Woodward asks us to set aside § 19.1 because he and another intervenor presented compelling evidence that is contrary to the Commission's determination. Our role is not to reweigh the evidence or substitute our judgment for that of the Commission. *See Freeport Minerals Corp.*, 244 Ariz. at 417, ¶ 34. The Commission is entrusted with the authority to render decisions regarding ratemaking after weighing the credibility of the various witnesses and exhibits, and it "is the best-equipped branch of government to do so." *Sierra Club--Grand Canyon Chapter v. Ariz. Corp. Comm'n*, 237 Ariz. 568, 574, ¶ 19 (App. 2015).

¶17 Overall, Woodward has not made a clear and convincing showing that the Commission's determination regarding § 19.1 was unlawful, unreasonable, or unsupported by substantial evidence. Therefore, we affirm its adoption in Decision 76295.

## II. Decision 76374:  AMI Opt-Out Program

¶18 The settlement agreement's AMI Opt-Out Program allows APS residential customers who do not want an AMI meter to "opt-out" and have their electricity monitored by an analog or digital meter (requiring traditional meter reading).  This program was heavily litigated during the evidentiary hearing and bifurcated for a separate decision by the ALJ. Section 30 states as follows:

> The AMI Opt-Out program will be approved as proposed by APS except the fees will be changed to reflect an upfront fee of $50 to change out a standard meter for a non-standard meter and monthly fee of $5.  See Service Schedule 1, attached as Appendix M.

As we understand Woodward's arguments, he asserts that Decision 76374 should be set aside because (1) the findings of facts are not supported by evidence; (2) the ALJ should have considered newly discovered evidence; and (3) the decision is fatally flawed because the ALJ was biased against him.

### A. Findings of Fact – Lack of Evidence

¶19 Woodward argues that because findings of fact numbers 349 through 354 rely on evidence and testimony presented by other parties to the proceedings, the findings constitute "baseless opinions" that are "completely unsubstantiated by fact, by competent evidence or witnesses."[7] He contends he "presented [the] probative evidence" that should determine the outcome of this case because the other parties' testimony and exhibits are not evidence.

¶20 These factual findings state in relevant part:

> 349. The evidence presented does not support allegations that AMI meters pose a risk to public safety or health beyond

---

[7] Woodward references finding of fact number 348 in his appellate briefing, but he did not adequately preserve this contention in his application for rehearing.  See A.R.S. § 40-253.

those risks inherent to the delivery of electricity to homes and businesses, and those inherent to the use and enjoyment of modern electrical appliances and conveniences in those homes and businesses.

350. APS's AMI meters comply with the applicable safety standards.

351. Allegations were made regarding . . . risks in association with the use of AMI meters. The evidence presented does not support those claims.

352. Section 30 and Schedule M of the Settlement Agreement provide a means for . . . customers who do not wish to receive service with APS's standard AMI meter, for whatever reason, to request a non-AMI meter for a one-time installation fee and a monthly fee, both of which are cost-based.

353. The evidence demonstrates that the fees proposed . . . are reasonable and appropriate, and that the requirements for participation proposed . . . are also reasonable and appropriate.

354. The record in this proceeding does not support allegations that the proposed fees or requirements for participation . . . are discriminatory.

¶21 Broadly speaking, evidence is anything a party relies upon to prove its position in a legal proceeding. *See* Rev. Ariz. Jury Instr. Preliminary 3 (4th ed. 2013) (defining "evidence" as the "testimony of witnesses, any documents and other things received in evidence as exhibits, and any facts stipulated, or agreed to, by the parties or which [the jury is] instructed to accept"); *see also* A.A.C. R14-3-109 (describing various forms of evidence parties may rely on at Commission hearings). The general test for admissibility is not whether something is or is not evidence, but whether it is relevant to the case. *See* Ariz. R. Evid. 401, 402; *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 496 (1987) (explaining that relevancy is a two-part test requiring that the evidence relate to a consequential fact placed at issue from "the pleadings and substantive law" and "alter the [fact's] probability, not prove or disprove [its] existence").

¶22 Here, the documentation properly submitted to the ALJ during these proceedings and the live testimony of several witnesses

(including Woodward) constitute the evidence the ALJ was tasked with evaluating, and, issuing findings related thereto. The depth to which the ALJ considered every piece of evidence is not pertinent on review because we will uphold the factual findings unless the party opposing them clearly and convincingly demonstrates that the findings are unlawful, unreasonable, or unsupported by substantial evidence. *See Litchfield Park Serv. Co.*, 178 Ariz. at 434. To the extent Woodward argues his evidence is more probative, we reiterate that we do not re-weigh the evidence that was presented to the Commission or substitute its judgment with our own. *See supra* ¶ 16.

**¶23**       Woodward also argues the findings of fact violate A.R.S. § 41-1063 because each finding of fact does not analyze the evidence or state why the ALJ found it more persuasive. Section 41-1063 applies to "contested cases," which exempts rate-making proceedings conducted under Article 15 of the Constitution. A.R.S. § 41-1001(5). Even so, the ALJ's findings sufficiently allow us to discern how she reached her conclusions because the ROO discussed the positions of the parties and included references to the hearing's transcripts and the parties' briefs. *Cf. Shelby Sch. v. Ariz. State Bd. of Educ.*, 192 Ariz. 156, 163, ¶ 21 (App. 1998) (explaining how even when § 41-1063 applies "[t]he findings need not be detailed nor in any particular form, though the reviewing court must be able to discern how the agency reached its conclusion"). Thus, Woodward has not demonstrated that the findings of fact are unlawful, unreasonable, or unsupported by substantial evidence.

## B.       Findings of Fact:  Miscellaneous

**¶24**       Woodward makes sub-arguments regarding why some of the findings of fact are unsupported. We address these arguments to the extent we understand them to pose questions that are not contingent on us re-weighing the evidence or substituting our judgment for that of the Commission.

**¶25**       In No. 349, the Commission found that AMI meters are not likely to pose a risk beyond those inherent to the delivery, use, and enjoyment of electricity in homes and businesses. Woodward argues the Commission has "facilitated, and is complicit in, APS's violation" of A.R.S. § 40-361(B), which states that "[e]very public service corporation shall furnish and maintain such service, equipment and facilities as will promote the safety, health, comfort and convenience of its patrons." Woodward seems to suggest that any service, equipment, or facility that does not actively enhance the health of APS's customers is violative of this statute.

However, Woodward does not cite any legal authority for this interpretation, and thus he has not clearly and convincingly demonstrated No. 349 is unlawful, unreasonable, or unsupported by substantial evidence.

**¶26** Regarding No. 351, Woodward argues it violates the Commission's earlier decision (Decision 75047) that states the rate case should consider "issues that may surround smart meters." Specifically, Woodward asserts that Decision 76374 does not address the following: (1) the possibility that APS is trespassing and stealing customer property when it gathers a customer's data; (2) the inaccuracy of smart meter data; and (3) the damage smart meters do to household appliances. Contrary to Woodward's assertions, the record indicates the Commission heard testimony on these issues and discussed them in the ROO when it outlined Woodward's arguments. Furthermore, Decision 76374 specifically states, "Pursuant to Commission Decision No. 75047 . . . issues related to APS's Proposed Automated Meter Opt-Out Service Schedule were addressed in this proceeding." Therefore, we reject Woodward's assertion that the Commission failed to comply with Decision 75047 because it is within the Commission's discretion to interpret the requirements of a prior order unless that interpretation is clearly erroneous. *See Grand Canyon Trust v. Ariz. Corp. Comm'n*, 210 Ariz. 30, 35–36, ¶ 20 (App. 2005) (citations omitted).

**¶27** As for No. 352, Woodward asserts the finding of fact is misleading because "not just any APS customer can refuse a 'smart' meter," thus "[m]any APS customers who would like to refuse a 'smart' meter are unnecessarily discriminated against." Woodward's unsupported allegation does not clearly and convincingly demonstrate that APS is acting in a discriminatory manner because impermissible discrimination requires that APS provide different services to similarly situated customers or charge them different rates for the same or substantially the same service. *See supra* ¶¶ 13–14. Here, APS is merely restricting solar and commercial customers from participating in the AMI Opt-Out Program. This is not discriminatory because solar and commercial customers are not similarly situated with respect to residential customers who can participate in the AMI Opt-Out Program.

**¶28** Finally, Woodward argues that No. 353 is a "fantasy" because "[t]he requirements for participation are highly discriminatory." The requirements Woodward takes issue with are found in APS's Service Schedule 1, under the label "8.5 Discontinuation of Non-Standard Metering." In that document, APS lists five conditions that allow APS to replace a non-standard meter with a standard meter based on health and safety concerns, or misuse of a meter. Applying these five conditions to

customers who already have an AMI meter is illogical because the smart meters are read remotely and automatically alert APS to meter misuse or tampering; therefore, the five conditions only apply to customers who participate in the AMI Opt-Out Program.

**¶29**     In sum, we conclude that Woodward has not clearly and convincingly demonstrated the findings of fact are unlawful, unreasonable, or unsupported by substantial evidence.

### C.     New Evidence

**¶30**     Woodward asserts that the ALJ should have considered an exhibit he attached to his initial closing brief and two other exhibits he attached to his reply closing brief as admissible evidence. Although the ALJ took notice of these exhibits, she found they "do not constitute evidence subject to cross-examination of a sponsoring witness, and cannot be accorded any weight" because "[t]he purpose of legal briefs is not to enter new evidence into the record, but to allow parties an opportunity to set forth their legal arguments on evidence presented in a proceeding."

**¶31**     Hearings before the Commission are governed by A.R.S. §§ 40-241 to -56 and "by rules of practice and procedure adopted by the [C]ommission." A.R.S. § 40-243; *see* A.A.C. R14-3-101 to -13. These rules provide the following guidance: "Once a party has rested his case he shall not be allowed to introduce further evidence without consent of the presiding officer." A.A.C. R14-3-109(G). Woodward rested his case on May 1, 2017, and after his testimony was finished, he responded affirmatively to the ALJ's question regarding whether he had been given a "full and fair opportunity to present [his] case." Accordingly, the ALJ acted within her discretion in declining to allow the introduction of new evidence after the hearing was completed. *Cf. Higgins v. Indus. Comm'n*, 16 Ariz. App. 136, 138–39 (1971) ("[E]vidence submitted after a formal hearing is not admissible" because it must be "presented in sufficient time to allow for cross-examination at the hearing.").

### D.     Judicial Bias

**¶32**     Despite answering in the affirmative when the ALJ asked if he "had a full and fair opportunity" to present his case, Woodward now argues that the decision is "fatally flawed" because the ALJ exercised "[g]ross judicial bias in favor of APS and prejudice against [Woodward]." Among his allegations, Woodward asserts that the ALJ

(1) "did the work of the APS lawyers" when she stopped a line of questioning and told him it was argumentative, despite no APS lawyer objecting;

(2) turned due process on its head by telling him "a data request would have gotten you those numbers prior to the hearing. Just saying."; and

(3) "took it upon herself to include in her ROO" APS evidence—the Arizona Department of Health Services study—even though he "totally discredit[ed]" the evidence with his own.

**¶33**       Woodward has failed to rebut the presumption that a hearing officer is "fair and can be disqualified only upon a showing of actual bias." *Berenter v. Gallinger*, 173 Ariz. 75, 82 (App. 1992); *Jenners v. Indus. Comm'n*, 16 Ariz. App. 81, 83 (1971) (explaining that absent "an applicable statute . . . or administrative rule" actual bias is the standard in an administrative hearing). Actual bias is shown by "demonstrat[ing] that the mind of the decision maker is 'irrevocably closed' on the particular issues being decided." *Hourani v. Benson Hosp.*, 211 Ariz. 427, 434, ¶ 23 (App. 2005) (citation omitted). To meet this standard, it must be clear that "any bias or predetermination of the facts is based on an 'extrajudicial source' that results in a decision based on something" outside of the hearing. *Id.* (citations omitted). None of Woodward's assertions are based on matters from outside the hearing process nor do they provide any showing that the ALJ's mind was irrevocably closed in deciding the issues before her. Thus, Woodward has not established judicial bias.

## CONCLUSION

¶**34** Because Woodward has not clearly and convincingly demonstrated that the Commission's determinations regarding § 19.1 in Decision 76295 and § 30 in Decision 76374 are unlawful, unreasonable, or unsupported by substantial evidence, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:  AA